**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
(SAN ANTONIO DIVISION)**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>THE STATE OF ALASKA,<br><br>THE STATE OF HAWAII, AND<br><br>THE NORTHWEST CLEAN AIR AGENCY,<br><br>       Plaintiffs,<br>v.<br><br>TESORO REFINING & MARKETING<br>COMPANY LLC,<br><br>TESORO ALASKA COMPANY LLC,<br><br>TESORO LOGISTICS L.P., AND<br><br>PAR HAWAII REFINING, LLC,<br><br><br>       Defendants. | Civ. No. _____ SA-16-cv-00722 |

## <u>COMPLAINT</u>

Plaintiff, the United States of America, by the authority of the Attorney General, through its undersigned attorneys, and at the request of the Administrator of the United States Environmental Protection Agency (EPA), and the State of Alaska, the State of Hawaii, and the Northwest Clean Air Agency (NWCAA) hereby file this Complaint and allege the following:

### I.      <u>NATURE OF ACTION</u>

1.      This is a civil action brought pursuant to Section 113(b)(2) of the Clean Air Act (CAA), 42 U.S.C. § 7413(b)(2), and various State laws and regulations, against Defendants with

respect to their petroleum refining and related facilities located in Anacortes, Washington;

Kapolei, Hawaii; Kenai Peninsula Borough, Alaska; Mandan, North Dakota; Martinez,

California; and Salt Lake City, Utah (collectively Defendants' Refineries).

    2.    The Plaintiffs allege that Defendants violated and/or continue to violate the

following federal and state statutory and regulatory requirements that are applicable to the

petroleum refining industry:

> The Prevention of Significant Deterioration Program (PSD Program) contained in Part C of Title I of the CAA, 42 U.S.C. §§ 7470-7492, and the regulations promulgated thereunder including 40 C.F.R. Part 52;

> The Non-Attainment New Source Review Program (NNSR Program) contained in Part D of Title I of the CAA, 42 U.S.C. §§ 7501-7515, and the regulations promulgated thereunder including 40 C.F.R. Part 51 and Appendix S;

> Federally-enforceable state implementation plans and federal implementation plans that implement the PSD and NNSR Programs;

> New Source Performance Standards promulgated at 40 C.F.R. Part 60, Subparts A, H, J, Kb, GG, GGG, GGGa, and QQQ, pursuant to Section 111 of the CAA, 42 U.S.C. § 7411;

> National Emission Standards for Hazardous Air Pollutants promulgated at 40 C.F.R. Part 61, Subparts A and FF, 40 C.F.R. Part 63, Subparts A, CC, and UUU, pursuant to Section 112 of the CAA, 42 U.S.C. § 7412;

> The requirements of Title V of the CAA found at 42 U.S.C. §§ 7661a, 7661b, 7661c, and the regulations promulgated thereunder at 40 C.F.R. §§ 70.1, 70.5-70.7;

> The Title V programs, regulations and/or permits promulgated or issued by the States of Alaska, California, Hawaii, North Dakota, and Utah, and by the Bay Area Air Quality Management District (BAAQMD) and NWCAA; and

> Other laws, permits, and regulations of Alaska, California, Hawaii, North Dakota, Utah, and Washington.

## II.      JURISDICTION, VENUE, AUTHORITY, AND NOTICE

3.      This court has jurisdiction over the subject matter of this action pursuant to

Sections 113(b) and 167 of the CAA, 42 U.S.C. §§ 7413(b), 7477, and 28 U.S.C. §§ 1331, 1345,

and 1355.  The Court has personal jurisdiction over the Parties.

4.      Venue is proper in this judicial district pursuant to Section 113(b) of the CAA,

42 U.S.C. § 7413(b), because Defendants Tesoro Alaska Company LLC, Tesoro Refining

& Marketing Company LLC, and Tesoro Logistics L.P. are headquartered in San Antonio,

Texas, which is within this judicial district.  All of the Defendants including Par Hawaii

Refining, LLC have consented to venue in this District.

5.      Authority to bring this action is vested in the United States Department of Justice

pursuant to Section 305 of the CAA, 42 U.S.C. § 7605, and 28 U.S.C. §§ 516 and 519.

6.      Authority to bring this action is vested in the Alaska Attorney General, acting on

behalf of the Alaska Department of Environmental Conservation of the State of Alaska, pursuant

to Section 304 of the CAA, 42 U.S.C. § 7604, and Alaska Statute § 44.03.020.

7.      Authority to bring this action is vested in the State of Hawaii by Section 304 of

the CAA, 42 U.S.C. § 7604, and Hawaii Revised Statutes (HRS) Section 342B-44.

8.      Authority to bring this action is vested in the NWCAA pursuant to Section 304 of

the CAA, 42 U.S.C. § 7604, and the Washington Revised Code §§ and 70.94.141.

9.      More than thirty days has elapsed since EPA provided notice pursuant to Section

113(a) of the CAA, 42 U.S.C. § 7413(a), of all violations of federally-enforceable state

implementation plans alleged herein to the Defendant who owns and operates each of those

refineries at which such violations occurred or are occurring and to the states in which those

refineries are located.

10.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), notice of commencement of this action has been given to applicable air pollution control agency for each refinery at which violations are alleged in this Complaint.

### III.    PARTIES AND SUBJECT FACILITIES

**A.    Plaintiffs**

11.    Plaintiff, the United States of America, is acting at the request of the United States Environmental Protection Agency, an agency of the United States.

12.    Plaintiff, the State of Alaska, is acting at the request of the Alaska Department of Environmental Conservation, a Department of the State of Alaska.

13.    Plaintiff, the State of Hawaii, is acting at the request of the Hawaii Department of Health, a Department of the State of Hawaii.

14.    Plaintiff the Northwest Clean Air Agency (formerly known as the Northwest Air Pollution Authority) is a municipal corporation established in accordance with the Washington Clean Air Act (RCW § 70.94) and has authority to enforce federal, state, and local air quality laws and regulations to facilities within Whatcom, Skagit, and Island Counties in the State of Washington.

**B.    Defendants and Relevant Facilities**

15.    Defendant Tesoro Alaska Company LLC (Tesoro Alaska) is incorporated in Delaware and maintains an office in San Antonio, Texas.  Defendant Tesoro Alaska owns and operates a petroleum refinery in the Kenai Peninsula Borough, Alaska (Kenai Refinery).

16.    Defendant Tesoro Refining & Marketing Company LLC (Tesoro R&M) is incorporated in Delaware and maintains an office in San Antonio, Texas.  Defendant Tesoro R&M owns and operates petroleum refineries in Anacortes, Washington (Anacortes Refinery);

Mandan, North Dakota (Mandan Refinery); Martinez, California (Martinez Refinery); and Salt

Lake City, Utah (SLC Refinery).  The Martinez Refinery is within the jurisdiction of BAAQMD.

17.     Defendant Tesoro Logistics L.P. (Tesoro Logistics) is incorporated in Delaware

and maintains an office in San Antonio, Texas.  Tesoro Logistics owns and/or operates various

assets, facilities, process units, and/or equipment at one or more of the refineries owned and

operated by Defendants Tesoro Alaska and Tesoro R&M.

18.     Defendant Par Hawaii Refining, LLC (Par) is incorporated in Hawaii and

maintains offices in Kapolei, Hawaii, and Houston, Texas.  Defendant Par owns and operates a

petroleum refinery in Kapolei, Hawaii (Kapolei Refinery).

19.     Each Defendant is a "person" within the meaning of Sections 111, 112, 165, 173,

302(e), and 502a of the CAA.  42 U.S.C. §§ 7411, 7412, 7475, 7503, 7602(e), and 7661a; federal

regulations promulgated thereunder; and federally-enforceable state implementation plans and

federal implementation plans, and other laws and permits to the extent that they adopt,

incorporate, and/or implement the federal requirements set forth above.

## IV.     STATUTORY AND REGULATORY BACKGROUND

20.     The Clean Air Act establishes a regulatory scheme designed to protect and

enhance the quality of the nation's air so as to promote the public health and welfare and the

productive capacity of its population.  42 U.S.C. § 7401(b)(1).

**A.     Prevention of Significant Deterioration and Non-Attainment
        New Source Review Program**

a.     National Ambient Air Quality Standards and Applicable Implementation Plans

21.     Section 108(a) of the CAA, 42 U.S.C. § 7408(a), requires EPA to issue air quality

criteria for each pollutant (criteria pollutant), the emissions of which cause or contribute to air

pollution which may reasonably be anticipated to endanger public health or welfare, and the

presence of which in the ambient air results from numerous or diverse mobile or stationary sources.

22.     Section 109(a) of the CAA, 42 U.S.C. § 7409, requires EPA to promulgate national ambient air quality standards (NAAQS) for each criteria pollutant.  EPA has promulgated NAAQS for sulfur oxides (which is measured in the ambient air as sulfur dioxide ($SO_2$)), nitrogen oxides (NOx) (which is measured in the ambient air as nitrogen dioxide), carbon monoxide (CO), ozone, particulate matter (PM), and lead.  40 C.F.R. Part 50.

23.     Section 107(d) of the CAA, 42 U.S.C. § 7407(d), requires EPA to promulgate designations of those areas within a state that do not meet the NAAQS (Non-Attainment areas), areas that meet NAAQS (Attainment areas), and areas that cannot be classified as meeting or not meeting the NAAQS (Unclassifiable areas).  Air quality designations can be found at 40 C.F.R. Part 81.

24.     Section 110 of the CAA, 42 U.S.C. § 7410, requires each state to adopt and submit to EPA for approval a state implementation plan (SIP) that provides for the implementation, maintenance, and enforcement of the NAAQS.  Once EPA approves a SIP, it is also independently enforceable by the federal government under Section 113 of the CAA, 42 U.S.C. § 7413.  If EPA disapproves a SIP or part thereof, it shall promulgate a federal implementation plan (FIP) that takes the place of those aspects of the SIP that were disapproved.  42 U.S.C. § 7410(b).  Collectively, the approved parts of a SIP and a FIP are known as Applicable Implementation Plans or AIP.  42 U.S.C. § 7602(q).

       b.     Prevention of Significant Deterioration Program and Regulations

25.     Part C of Title I (Sections 160 through 169B) of the CAA, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration (PSD) of air quality

in those areas designated as either Attainment or Unclassifiable for purposes of meeting the

NAAQS (PSD Program).  Among other things, the purpose of the PSD requirements is to protect

public health and welfare, to assure that economic growth will occur in a manner consistent with

the preservation of existing clean air resources, and to assure that any decision to permit

increased air pollution is made only after careful evaluation of all the consequences of such a

decision and after public participation in the decision making process.  42 U.S.C. § 7470.

26.     Section 161 of the CAA, 42 U.S.C. § 7471, requires each SIP to contain emission

limitations and such other measures as may be necessary to prevent significant deterioration of

air quality in each area designated as Attainment or as Unclassifiable.  EPA regulations (PSD

Regulations):  (a) establish minimum requirements for state PSD programs to be approved as

part of SIPs (codified at 40 C.F.R. § 51.166); (b) set forth FIP provisions that apply where a SIP

or part thereof is disapproved (40 C.F.R. § 52.21); and (c) set forth the EPA-approved SIPs and

FIPs for each state (AIPs) (codified at 40 C.F.R. Part 52).

27.     Pursuant to Section 165(a) of the CAA, 42 U.S.C. § 7475(a), no major emitting

facility may be constructed or modified in an Attainment or Unclassifiable area unless, among

other things:  (a) a PSD permit has been issued for the proposed facility; and (b) the proposed

facility is subject to the best available control technology (BACT) for each pollutant subject to

regulation under the CAA emitted from, or which results from, such facility.  42 U.S.C.

§§ 7475(a)(1), (4); 7479(2)(C) ("construction" includes the modification of a facility).  Similarly,

the PSD Regulations provide that no new major stationary source or major modification at an

existing source shall begin actual construction in an Attainment or Unclassifiable area without a

PSD permit stating that the major stationary source or major modification will meet the

requirements of 40 C.F.R. § 52.21(j)-(r), including the requirement to apply BACT.  40 C.F.R. § 52.21(a)(2)(i)-(iii), (j)(2)-(3).

28.     A "major emitting facility" under the PSD Program and a "major stationary source" under the PSD Regulations are defined as including petroleum refineries that are stationary sources of air pollutants that emit, or have the potential to emit, one hundred tons per year or more of:  (a) any air pollutant (as used in the PSD Program); or (b) any regulated NSR pollutant (as used in the PSD Regulations).  42 U.S.C. § 7479(1); 40 C.F.R. § 52.21(b)(1)(i)(a).

29.     A "regulated NSR pollutant" under the PSD Regulations includes, among other things, NOx, $SO_2$, CO, hydrogen sulfide ($H_2S$), and volatile organic compounds (VOCs). 40 C.F.R. § 52.21(b)(50).

30.     A "major modification" under the PSD Regulations is any physical change in or change in the method of operation of a major stationary source that would result in a significant emissions increase of a regulated NSR pollutant, and a significant net emissions increase of that pollutant from the major stationary source.  40 C.F.R. § 52.21(b)(2)(i).

31.     "Significant emissions increase" under the PSD Regulations includes, among other things, an increase in emissions that would equal or exceed the following amounts for the following pollutants:

| | |
|---|---|
| NOx | 40 tons per year (TPY) |
| $SO_2$ | 40 TPY |
| VOC | 40 TPY |
| CO | 100 TPY |
| $H_2S$ | 10 TPY |

40 C.F.R. § 52.21(b)(23)(i), (40).

32.     A "significant net emissions increase" under the PSD Regulations includes, among other things, an amount by which the sum of the following equals or exceeds one hundred tons per year of CO; ten tons per year of $H_2S$; or forty tons per year of either NOx, $SO_2$, or VOCs:  (a) the increase in emissions from a particular physical change or change in the method of operation at a stationary source; and (b) any other increases or decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable.  40 C.F.R. § 52.21(b)(3)(i), (23)(i).

33.     The PSD Regulations require that:  (a) a new major stationary source shall apply BACT for each regulated NSR pollutant that it would have the potential to emit in significant amounts; and (b) a major modification shall apply BACT for each regulated NSR pollutant for which it would result in a significant net emissions increase at the source.  40 C.F.R. § 52.21(j)(2)-(3).

34.     Any owner or operator of a source or modification subject to the PSD Regulations who commences construction without applying for and receiving approval under the AIP is subject to appropriate enforcement action.  40 C.F.R. § 52.21(r).

35.     The States of Alaska, California, Hawaii, North Dakota, Utah and Washington each have SIPs approved by EPA and/or FIPs that set forth the above-described requirements. *See* 40 C.F.R. Part 52, Subpart C (§§52.70-98) (Alaska SIP); Subpart F (§§ 52.219-283) (California SIP); Subpart M (§§ 52.620-634) (Hawaii SIP); Subpart JJ (§§ 52.1820-1837) (North Dakota SIP); Subpart TT (§§ 52.2320-2355) (Utah SIP), and Subpart WW (§§ 52.2470-2502) (Washington SIP).  EPA found parts of the California, Hawaii and Washington SIPs did not include approvable PSD requirements and therefore EPA promulgated FIPs (containing the federal PSD regulations of 40 C.F.R. § 52.21), which it incorporated as part of the AIPs and PSD

Regulations for those states.  40 C.F.R. §§ 52. 270(a), 52.632, 52.2497.  On April 29, 2015, EPA approved updates to the Washington SIP addressing PSD requirements, including the incorporation by reference of the FIP.  *See* 82 Fed. Reg. 23,721 (April 20, 2015); 40 C.F.R. Part 52, Subpart WW.

      c.    <u>Non-Attainment New Source Review Program and Regulations</u>

36.    Part D of Title I (Sections 171 through 193) of the CAA, 42 U.S.C. §§ 7501-7515, sets forth SIP requirements for those areas designated as Non-Attainment for purposes of meeting the NAAQS (NNSR Program).  In general, the NNSR Program requires each SIP to provide for the implementation of all reasonably available control measures as expeditiously as practicable and to provide for attainment of the NAAQS.  42 U.S.C. § 7502(c)(1).

37.    Pursuant to Section 172(c)(5) of the CAA, 42 U.S.C. § 7502(c)(5), each SIP must require permits for construction and operation of new or modified major stationary sources in the Non-Attainment areas within a state, in accordance with Section 173 of the CAA.

38.    EPA has promulgated regulations that establish minimum requirements for state NNSR programs to be approved as part of SIPs (codified at 40 C.F.R. § 51.165 and Appendix S). These regulations, as well as the SIP-approved NNSR rules are referred to as the NNSR Regulations.  Specifically, similar to the PSD Program and Regulations, state NNSR Regulations must provide that no new major stationary source or major modification may be issued a permit to construct unless certain requirements are met.  40 C.F.R. Part 51.  For the most part, the NNSR Regulations use the same definitions as the PSD Regulations (specified in Paragraphs 28-34 above) for such terms as "major stationary source," "major modification," "significant emissions increase," "significant," and "net emissions increase."  *See* 40 C.F.R. § 51.165.

<u>United States, et al. v. Tesoro, et al.</u> Complaint          Page 10.

39.     Pursuant to Section 173 of the CAA, 42 U.S.C. § 7503, and EPA-approved state NNSR Regulations, if a new major stationary source or major modification triggers the requirements of the NNSR Program, the owner and/or operator must obtain a NNSR permit that, among other things:  (a) secures federally-enforceable emission offsets that are at least as great as the new or modified source's emissions; (b) requires compliance with the lowest achievable emission rate as defined in Section 171(3) of the CAA, 42 U.S.C. § 7501(3); and (c) analyzes alternative sites, sizes, production processes, and environmental control techniques for the proposed source and demonstrates that the benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.  42 U.S.C. § 7503(a)–(c); 40 C.F.R. Part 51.

**B.     New Source Performance Standards (NSPS) (Excluding Leak Detection and Repair Requirements and Flaring Requirements)**

a.     <u>NSPS In General</u>

40.     Section 111(b)(1) of the Act, 42 U.S.C. § 7411(b)(1), requires EPA to: (a) publish a list of categories of stationary sources that, in its judgment, cause or contribute significantly to air pollution that may reasonably be anticipated to endanger the public health or welfare; and (b) promulgate standards of performance for new sources within those categories. These standards, commonly known as the New Source Performance Standards, are codified at 40 C.F.R. Part 60 and referred to herein as NSPS or NSPS Regulations.

41.     "New source" is defined as a stationary source, the construction or modification of which is commenced after the publication of the regulations (or, if earlier proposed regulations) prescribing a standard of performance applicable to such source.  42 U.S.C. § 7411(a)(2).  "Stationary source" is defined as any "building, structure, facility, or installation which emits or may emit any air pollutant."  42 U.S.C. § 7411(a)(3).

42.     Section 111(e) of the CAA, 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source from operating any new (i.e., constructed or modified) source in violation of an NSPS after the effective date of the NSPS applicable to such source.

b.     Specific NSPS Requirements Relevant to this Complaint (Excluding Leak Detection and Repair and Flaring NSPS Requirements).

43.     Pursuant to Section 111(b) of the CAA, EPA has promulgated NSPS Regulations for the following source categories which are relevant to this Complaint:

NSPS general provisions applicable to all NSPS sources, which are codified at 40 C.F.R. Part 60, Subpart A (NSPS Subpart A);

NSPS for stationary gas turbines, which are codified at 40 C.F.R. Part 60, Subpart GG (NSPS Subpart GG);

NSPS for sulfuric acid plants, which are codified at 40 C.F.R. Part 60, Subpart H (NSPS Subpart H);

NSPS for petroleum refineries, which are codified at 40 C.F.R. Part 60, Subpart J (NSPS Subpart J);

NSPS for volatile organic liquid storage vessels, which are codified at 40 C.F.R. Part 60, Subpart Kb (NSPS Subpart Kb); and

NSPS for VOC emissions from petroleum refinery wastewater systems, which are codified at 40 C.F.R. Part 60, Subpart QQQ (NSPS Subpart QQQ).

44.     **NSPS Subpart A Applicable to All NSPS Sources.**  Pursuant to Section 111(b) of the CAA, 42 U.S.C. § 7411(b), EPA promulgated NSPS Subpart A, which are general NSPS Regulations that apply to the owner or operator of any stationary source which contains an "affected facility," the construction or modification of which is commenced after the publication of any NSPS (or, if earlier, the date of publication of any proposed standard) applicable to that facility.  40 C.F.R. § 60.1.  An "affected facility" is defined as any apparatus to which a standard is applicable. 40 C.F.R. § 60.2.

45.    NSPS Subpart A applies to all affected facilities, including associated air pollution control equipment, and requires that, at all times, including periods of startup, shutdown, and malfunction, "owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions."  40 C.F.R. § 60.11(d).

46.    **NSPS Subpart GG Applicable to Stationary Gas Turbines.**  Pursuant to Section 111(b) of the CAA, 42 U.S.C. § 7411(b), EPA promulgated NSPS Subpart GG, which applies to the following affected facilities:  any stationary gas turbines with a heat input at peak load equal to or greater than 10.7 gigajoules (10 million British Thermal Units (BTU)) per hour that commences construction, reconstruction, or modification after October 3, 1977.  40 C.F.R. § 60.330(a)-(b).  A stationary gas turbine means any simple cycle gas turbine, regenerative cycle gas turbine or any gas turbine portion of a combined cycle steam/electric generating system that is not self-propelled (it may, however, be mounted on a vehicle for portability).  40 C.F.R. § 60.331.  Each such stationary gas turbine is an "affected facility" subject to the requirements of NSPS Subpart GG, 40 C.F.R. § 60.330 *et seq.*

47.    **NSPS Subpart H Applicable to Sulfuric Acid Plants.**  Pursuant to Section 111(b) of the CAA, 42 U.S.C. § 7411(b), EPA promulgated NSPS Subpart H, which applies to the following affected facilities:  any sulfuric acid production unit that commences construction, reconstruction, or modification after August 17, 1971.  40 C.F.R. § 60.80(a)-(b).  A "sulfuric acid production unit" means any facility producing sulfuric acid by the contact process by burning elemental sulfur, alkylation acid, hydrogen sulfide, organic sulfides and mercaptans, or acid sludge, but does not include facilities where conversion to sulfuric acid is utilized primarily

as a means of preventing emissions to the atmosphere of sulfur dioxide or other sulfur compounds.  40 C.F.R. § 60.81(a).  Each such sulfuric acid production unit is an "affected facility" subject to the requirements of NSPS Subpart H, 40 C.F.R. § 60.80 *et seq.*

48.    **NSPS Subpart J Applicable to Petroleum Refineries.**  Pursuant to Section 111(b) of the CAA, 42 U.S.C. § 7411(b), EPA promulgated NSPS Subpart J, which applies to the following affected facilities at petroleum refineries:  (a) any fluid catalytic cracking unit (FCCU) catalyst regenerator or fuel gas combustion device (FGCD) other than a flare that commences construction, reconstruction, or modification after June 11, 1973, and on or before May 14, 2007; (b) any FGCD that is also a flare that commences construction, reconstruction, or modification after June 11, 1973, and on or before June 24, 2008; and (c) any Claus sulfur recovery plant (SRP) with a design capacity for sulfur feed of more than 20 long tons per day that commences construction, reconstruction, or modification after October 4, 1976, and on or before May 14, 2007.  40 C.F.R. § 60.100(a)-(b).  Each such FCCU catalyst regenerator, FGCD, and SRP is an "affected facility" subject to the requirements of NSPS Subpart J, 40 C.F.R. § 60.100 *et seq.*

49.    **NSPS Subpart Kb Applicable to Volatile Organic Liquid Storage Vessels.** Pursuant to Section 111(b) of the CAA, 42 U.S.C. § 7411(b), EPA promulgated NSPS Subpart Kb, which applies to the following affected facilities:  any storage vessel with a capacity greater than or equal to 75 cubic meters that is used to store volatile organic liquids for which construction, reconstruction, or modification is commenced after July 23, 1984.  40 C.F.R. § 60.110b(a).  Each such storage vessel is an "affected facility" subject to the requirements of NSPS Subpart Kb, 40 C.F.R. § 60.110b *et seq.*

50.    **NSPS Subpart QQQ Applicable to Petroleum Refinery Wastewater Systems.**
Pursuant to Section 111(b) of the CAA, 42 U.S.C. § 7411(b), EPA promulgated NSPS Subpart QQQ, which applies to the following affected facilities at petroleum refineries:  individual drain systems, oil-water separators, and aggregate facilities that commenced construction, reconstruction, or modification after May 4, 1987.  40 C.F.R. § 60.690(a).  Each such individual drain system, oil-water separator, and aggregate facility described above is an "affected facility" subject to the requirements of NSPS Subpart QQQ, 40 C.F.R. § 60.690 et. seq.

C.    **National Emission Standards for Hazardous Air Pollutants (NESHAP) (Excluding Leak Detection and Repair Requirements and Flaring Requirements)**

a.    NESHAP in General

51.    Section 112 of the CAA, 42 U.S.C. § 7412, requires EPA to promulgate NESHAP regulations to address the hazardous air pollutants (HAPs) listed in Section 112(b), as revised by EPA.  42 U.S.C. § 7412(b); 40 C.F.R. Part 63, Subpart C.  EPA regulations promulgated under Section 112 of the CAA are referred to herein as NESHAP Regulations.

52.    Prior to the CAA Amendments of 1990, NESHAP Regulations promulgated pursuant to Section 112 were codified in 40 C.F.R. Part 61 (Part 61 NESHAP) and remain in force and effect.  *See* Section 112(q)(1) of the CAA, 42 U.S.C. § 7412(q)(1).

53.    The CAA was amended in 1990 and required EPA to publish a list of all categories and subcategories of, *inter alia*, "major sources" of HAPs and to promulgate regulations establishing emission standards for each such category or subcategory.
42 U.S.C. § 7412(c) and (d)(1).  "Major source" is defined as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 TPY or more of any HAP or
25 TPY or more of any combination of HAPs.  42 U.S.C. § 7412(a)(1).  "Stationary source" is

defined as any building, structure, facility, or installation which emits or may emit any air pollutant.  42 U.S.C. § 7412(a)(3) (stating that "stationary source" under Section 112(a) has the same meaning as that term has under Section 111(a) of the CAA, 42 U.S.C. § 7411(a)).

54.    Pursuant to Section 112 of the 1990 Amendments of the CAA, 42 U.S.C. § 7412, EPA has promulgated emission standards or, if not feasible, design, equipment, work practice, or operational standards which are codified at 40 C.F.R. Part 63 (Part 63 NESHAP).  The Part 63 NESHAP Regulations are based on the "maximum degree of reduction in emissions" that EPA determines is achievable (*Id.*, § 7412(d)(2)), and thus are also commonly known as maximum achievable control technology (MACT) standards.

55.    After the effective date of any emission standard, limitation, or regulation promulgated pursuant to Section 112 of the CAA, no person may operate a source in violation of an applicable NESHAP Regulation.  42 U.S.C. § 7412(i)(3).

    b.    Specific NESHAP Requirements Relevant to this Complaint (Excluding LDAR and Flaring Requirements)

56.    Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA has promulgated the following NESHAP Regulations that are relevant to this Complaint:

> NESHAP general provisions under Part 61, which are codified at 40 C.F.R. Part 61, Subpart A (NESHAP Subpart A);
>
> NESHAP general provisions under Part 63, which are codified at 40 C.F.R. Part 63, Subpart A (Part 63 NESHAP Subpart A);
>
> NESHAP applicable to petroleum refinery storage vessels, which are codified at 40 C.F.R. Part 63, Subpart CC (NESHAP Subpart CC);
>
> NESHAP applicable to benzene-containing waste streams at petroleum refineries, which are codified at 40 C.F.R. Part 61 Subpart FF (NESHAP Subpart FF);
>
> NESHAP applicable to catalytic cracking units, catalytic reforming units, and sulfur recovery units at petroleum refineries, which are codified at 40 C.F.R. Part 63 Subpart UUU (NESHAP Subpart UUU).

57.     **Part 61 NESHAP Subpart A**.  Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, as it existed before the 1990 CAA Amendments, EPA promulgated Part 61 NESHAP Subpart A, which are general provisions applicable to all sources that are subject to the Part 61 NESHAP Regulations.  40 C.F.R. §§ 61.01–61.19.  Part 61 NESHAP Subpart A includes a requirement that corresponds to the "good air pollution control practices" requirement of NSPS Subpart A that "[t]he owner and operator of each stationary source shall maintain and operate the source, including associated equipment for air pollution control, in a manner consistent with good air pollution control practices for minimizing emissions."  Part 61 NESHAP Subpart A, 40 C.F.R. § 61.12(c).

58.     **Part 63 NESHAP Subpart A**.  Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, as it existed after the 1990 CAA Amendments, EPA promulgated Part 63 NESHAP Subpart A, which are general provisions applicable to all sources that are subject to the NESHAP Regulations in 40 C.F.R. Part  63.  40 C.F.R. §§ 63.1-63.16.  Like Part 61 NESHAP Subpart A and NSPS Subpart A, Part 63 NESHAP Subpart A includes a requirement that owners and operators implement "good air pollution control practices" at all times, including periods of startup, shutdown, and malfunction.  40 C.F.R. § 63.6(e)(1)(i).  Under Part 63 NESHAP Subpart A, each relevant NESHAP in 40 C.F.R. Part 63 must identify whether each provision in Part 63 NESHAP Subpart A is or is not included in such NESHAP.  40 C.F.R. § 63.1(a)(4)(i).

59.     **NESHAP Subpart CC Applicable to Petroleum Refinery Storage Vessels.** Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated NESHAP Subpart CC, which applies, *inter alia*, to storage vessels associated with petroleum refining process units. 40 C.F.R. §§ 63.640-671.  NESHAP Subpart CC requires some sources to comply with Part 63 NESHAP Subpart A.  42 C.F.R. § 63.642(c) and Table 6.

60.     **NESHAP Subpart FF Applicable to Benzene-Containing Waste Streams at Petroleum Refineries.**  Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated NESHAP Subpart FF, which applies, *inter alia*, to benzene-containing hazardous waste streams at petroleum refineries.  40 C.F.R. §§ 61.340-358.

61.     **NESHAP Subpart UUU Applicable to Catalytic Cracking Units, Catalytic Reforming Units, and Sulfur Recovery Units at Petroleum Refineries.**  Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated NESHAP Subpart UUU, which applies, *inter alia*, to the following affected sources at petroleum refineries, which themselves are major sources of HAPs:  the process vent or group of process vents on:  (a) FCCUs that are associated with regeneration of the catalyst used in the FCCUs; (b) catalytic reforming units (CRUs) that are associated with regeneration of the catalyst used in the CRUs; and (c) sulfur recovery units (SRUs) at an SRP or tail gas treatment units serving an SRP.  40 C.F.R. §§ 63.1560-1579.  Process vents or group of process vents and bypass lines on the above-listed sources of HAPs are "affected sources" subject to the requirements of NESHAP Subpart UUU, 40 C.F.R. § 1560 *et seq.*  NESHAP Subpart UUU also requires owners and operators of affected sources to comply with Part 63 NESHAP Subpart A, 40 C.F.R. §§ 63.6(e)(1) and 63.11(b).  40 C.F.R. § 63.1577 and Table 44.

**D.     NSPS and NESHAP Leak Detection and Repair Requirements.**

62.     Pursuant to Sections 111 and 112 of the CAA, EPA has promulgated several sets of regulations that establish leak detection and repair (LDAR) requirements which apply to petroleum refineries and associated facilities.  Collectively, these requirements are referred to as LDAR Requirements.  The focus of the LDAR Requirements is an inventory of all possible

leaking equipment, the regular monitoring of that equipment to identify leaks, and the timely and effective repair of leaks.

63.     **NSPS Subpart GGG Applicable to Equipment Leaks at Petroleum Refineries.**  Pursuant to Section 111(b) of the CAA, 42 U.S.C. § 7411(b), EPA promulgated NSPS Subpart GGG which applies to petroleum refinery compressors or "equipment" in "process units" that were constructed (commenced or completed), reconstructed, or modified after January 4, 1983, and on or before November 7, 2006.  40 C.F.R. §§ 60.590-93 (NSPS Subpart GGG).  A "process unit" includes components assembled to produce intermediate or final products from petroleum, unfinished petroleum derivatives, or other intermediates. 40 C.F.R. § 60.590(e).  "Equipment" means each valve, pump, pressure relief device, sampling connection system, open-ended valve or line, and flange or other connector in VOC service. 40 C.F.R. § 60.591.  Each such compressor and each such group of equipment within a process unit is an "affected facility" within the meaning of 40 C.F.R. §§ 60.2 and 60.590(a) and subject to the requirements of NSPS Subpart GGG, 40 C.F.R. § 60.590 *et seq.*

64.     **NESHAP Subpart CC Applicable to Petroleum Refining Process Units.** Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated the NESHAP Subpart CC which applies to "petroleum refining process units" and related emission points that are located at a plant site that is a "major source" and that emit or have equipment containing or contacting one or more of the HAPs listed in a table associated with NESHAP Subpart CC. 40 C.F.R. §§ 63.640-671.  NESHAP Subpart CC defines "petroleum refining process unit" to mean a process unit used in an establishment primarily engaged in petroleum refining as defined in the Standard Industrial Classification code for petroleum refining (2911), and used primarily for the following:  (a) producing transportation fuels (such as gasoline, diesel fuels, and jet

fuels), heating fuels (such as kerosene, fuel gas distillate, and fuel oils), or lubricants; (b) separating petroleum; or (c) separating, cracking, reacting, or reforming intermediate petroleum streams.  40 C.F.R. § 63.641.  All such emissions points, in combination, that are located at a single refinery plant site constitute an "affected source" subject to the requirements of NESHAP Subpart CC, 40 C.F.R. § 63.640 et seq.  Pursuant to NESHAP Subpart CC, 40 C.F.R. § 63.642(c) and Table 6, with certain exceptions that are not applicable here, owners or operators of affected facilities under Subpart CC are required to comply with Part 63 NESHAP Subpart A, 40 C.F.R. §§ 63.6(e) and 63.11(b).

65.    Under both NSPS Subpart GGG and NESHAP Subpart CC, applicable process units and petroleum refining processing units must comply with the requirements detailed in NSPS Subpart VV, 40 C.F.R. § 60.482 *et seq.*  NSPS Subpart GGG, 40 C.F.R. § 60.592; NESHAP Subpart CC, 40 C.F.R. § 63.648.

66.    NSPS Subpart VV sets forth specific monitoring and repairing requirements for four categories of equipment relevant to this Complaint:  (a) pumps in light liquid services (40 C.F.R. §§ 60.482-2, 482-9); (b) open-ended valves/lines (*id.* §§ 60.482-6, 482-9); (c) valves in gas/vapor service and in light liquid service (*id.* §§ 60.482-7, 482-9); and (d) pumps and valves in heavy liquid service (*id.* §§ 60.482-8, 482-9).

**E.    CAA Requirements Applicable to Flaring Devices**

67.    The CAA, including its PSD, NNSR, NSPS, and NESHAP provisions and requirements, contains overarching requirements that apply to owners and operators of flares.

68.     PSD/NNSR.  Flares are typically stationary sources of air pollutants and are therefore subject to the PSD and NNSR Programs and Regulations described in Paragraphs 21-39 above.  42 U.S.C. §§ 7470-7515.

69.     **NSPS Subpart A.**  As explained above, NSPS Subpart A requires that all affected facilities, which include flares as FGCDs, be operated "in a manner consistent with good air pollution control practices for minimizing emissions."  40 C.F.R. § 60.11(d).  In addition, within NSPS Subpart A, EPA promulgated specific regulations that apply whenever flares are used as control devices.  40 C.F.R. § 60.18(b)–(f).  Of relevance to this Complaint are the following requirements in NSPS Subpart A:  (a) flares shall be designed and operated with no visible emissions, *id.* § 60.18(c)(1); (b) flares shall be operated with a flame present at all times, *id.* § 60.18(c)(2); (c) for steam-assisted flares, the net heating value of the gas being combusted must be 300 BTU per standard cubic foot or greater, *id.* § 60.18(c)(3)(ii); (d) for steam-assisted flares, certain exit velocity requirements must be met, *id.* § 60.18(c)(4); (e) for all flares, the owner or operator must monitor the flare to ensure that it is operated and maintained in conformance with its design, *id.* § 60.18(d); and (f) a flare must be operated at all times when emissions are vented to it, *id.* § 60.18(e).

70.     **NSPS Subpart J**.  Flares are "fuel gas combustion devices" within the meaning of NSPS Subpart J.  40 C.F.R. § 60.101(g).  Under NSPS Subpart J, an owner or operator of a flare that is an affected facility is prohibited from burning any fuel gas in the flare that contains $H_2S$ in excess of 230 milligrams per dry standard cubic meter unless certain exceptions apply.  40 C.F.R. § 60.104(a)(1).  NSPS Subpart J also prohibits the discharge from any SRP of any gas that contains in excess of 250 parts per million by volume (ppmv) $SO_2$ at 0% air.  40 C.F.R. § 60.104(a)(2)(i).  NSPS Subpart J also requires the owner or operator of a flare that is an

affected facility to install, calibrate, operate, and maintain an instrument for continuously monitoring and recording the concentration (dry basis) of $H_2S$ in the fuel gases before being burned in any flare.  40 C.F.R. § 60.105(a)(4).

71.     **NSPS Subpart GGG and NESHAP Subpart CC (incorporating requirements of NSPS Subpart VV).**  Under both NSPS Subpart GGG and NESHAP Subpart CC, applicable process units and petroleum refining processing units must comply with the requirements detailed in NSPS Subpart VV (40 C.F.R. § 60.482 *et seq.*).  NSPS Subpart GGG, 40 C.F.R. § 60.592; NESHAP Subpart CC, 40 C.F.R. § 63.648.  NSPS Subpart VV requires flares that are used to control equipment leaks at affected facilities to comply with the general flare requirements in NSPS Subpart A, 40 C.F.R. 60.18 as set forth in Paragraph 69 above.  NSPS Subpart VV, 40 C.F.R. § 60.482-10(d).

72.     **Part 63 NESHAP Subpart A.**  Part 63 NESHAP Subpart A requires applicable affected sources, which includes flares, to be operated with "good air pollution control practices for minimizing emissions."  40 C.F.R. § 63.6(e)(1).  In addition, Part 63 NESHAP Subpart A contains specific requirements that apply whenever flares are used as control devices.  40 C.F.R. § 63.11(b).  Of relevance to this Complaint are the following requirements:  (a) flares shall be designed and operated with no visible emissions, *id.* § 63.11(b)(4); (b) flares shall be operated with a flame present at all times, *id.* § 63.11(b)(5); (c) for steam-assisted flares, the net heating value of the gas being combusted must be 300 BTU per standard cubic foot or greater, *id.* § 63.11(b)(6)(ii); (d) for steam-assisted flares, certain exit velocity requirements must be met, *id.*4 § 63.11(b)(7); (e) the owner or operator must monitor the flare to ensure that it is operated and maintained in conformance with its design, *id.* § 63.11(b)(1); and (f) a flare must be operated at all times when emissions are vented to it,  *id.* § 63.11(b)(3).

73.     **NESHAP Subpart CC.**  Pursuant to NESHAP Subpart CC, owners or operators of certain types of process vents subject to NESHAP Subpart CC must reduce emissions of organic HAPs from these vents by using either:  (a) a flare that meets the requirements of 40 C.F.R. § 63.11(b) (set forth in Paragraph 72 above), 40 C.F.R. § 63.643(a)(1); or (b) a different type of control device that reduces organic HAPs by 98 weight percent or to a concentration of 20 ppmv, 40 C.F.R. § 63.643(a)(2).

74.     **NESHAP Subpart FF.**  Flares used as control devices for closed vent systems are subject to Part 61 NESHAP Subpart FF and must comply with the general good pollution control practices requirements in Part 61 NESHAP Subpart A, 40 C.F.R. § 61.12, set forth in Paragraph 72 above.  NESHAP Subpart FF, 40 C.F.R. § 61.349(a)(2)(iii).

75.     **NESHAP Subpart UUU.**  Pursuant to NESHAP Subpart UUU, flares used to control vent emissions of total organic compounds (TOC) at affected sources under NESHAP Subpart UUU must meet the requirements of Part 63 NESHAP Subpart A, 40 C.F.R. §§ 63.6(e)(1)-(2) and 63.11(b), set forth in Paragraph 72 above.  40 C.F.R. § 63.1566(a)(1)(i), Tables 15 and 44.

**F.     CAA Title V Requirements**

76.     Title V of the CAA, 42 U.S.C. §§ 7661-7661f, and the regulations promulgated thereunder (federal Title V Program and Regulations) establish an operating permit program for certain sources, including "major sources" and any source required to have a PSD or NNSR Permit.  42 U.S.C. § 7661a(a).  Under this operating permit program all "applicable requirements" for compliance with the CAA, including SIP and FIP requirements, are set forth in one operating permit known as a Title V permit.  42 U.S.C. § 7661c(a) and 40 C.F.R. § 70.6(a).

77.     Pursuant to Section 502(b) of the CAA, 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. 57 Fed. Reg. 32,250 (July 21, 1992).  These regulations are codified at 40 C.F.R. Part 70.

78.     The States of Alaska and Hawaii, and the NWCAA each have an EPA-approved Title V program and are authorized to issue and enforce Title V permits.  *See* 40 C.F.R. Part 70 Appendix A.

79.     The federal Title V Program and Regulations and the Title V permit program and regulations of Alaska, Hawaii and NWCAA provide that, after the effective date of the state or local Title V permit program, no source subject to Title V may operate except in compliance with a Title V permit.  42 U.S.C. § 7661a(a); 40 C.F.R. §§ 70.1(b) and 70.7(b); Alaska Statute §§ 46.14.129(b), 130(b); Hawaii Administrative Rule (HAR) § 11-60.1-82; NWCAA Regulation Section 104.1.

80.     The federal Title V Program and Regulations and the Title V permit program and regulations of Alaska, Hawaii and NWCAA require each owner and operator of a source to submit a permit application containing:  (a) information sufficient to determine all applicable air pollution control requirements (including any requirement to meet the applicable control technology requirements under the PSD and NNSR programs and to comply with the applicable NSPS and/or NESHAP standards); (b) information that may be necessary to determine the applicability of other applicable requirements of the CAA; (c) a compliance plan for all applicable requirements for which the source is not in compliance; and (d) a certification of compliance with all applicable requirements by a responsible official.  42 U.S.C. § 7661b(c);

40 C.F.R. § 70.5; Title 18 Alaska Administrative Code Chapter 50 (18 AAC § 50.326(a)); HAR § 11-60.1-83; NWCAA Regulations Section 104.

81.     Under the federal Title V Program and Regulations, and the Title V permit program and regulations of Alaska, Hawaii, and NWCAA, any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.  40 C.F.R. § 70.5(b); Alaska Statute §§ 46.14.160(c); 18 AAC § 50.040(j) (incorporating 40 C.F.R. § 71.5(b) by reference); HAR § 11-60.1-84; NWCAA Regulations Section 104.1.

82.     All terms and conditions of a Title V permit are federally enforceable.  42 U.S.C. § 7413(b); 40 C.F.R. § 70.6(b).

**G.     CAA and State Enforcement Authorities**

83.     Section 113(a)(1) and (3) of the CAA, 42 U.S.C. § 7413(a)(1) and (3), authorize EPA to bring a civil action under Section 113(b) if EPA finds that any person is in violation of any requirement or prohibition of Sections 111 or 112 of the CAA, an AIP, the PSD or NNSR Programs, a PSD or NNSR permit, NSPS requirement, NESHAP requirement, the federal Title V Program or Regulations, or a Title V permit.

84.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the Court to enjoin a violation, to require compliance, to assess and recover a civil penalty, and to award any other appropriate relief for each violation.

85.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes civil penalties of up to $25,000 per day for each violation of the CAA.

86.     The statutory maximum civil penalty for enforcement actions under Section
113(b) of the CAA have been periodically increased pursuant to the Federal Civil Penalties
Inflation Adjustment Act of 1990 (28 U.S.C. § 2461) (2012), as amended by the Debt Collection
Improvement Act of 1996 (31 U.S.C. § 3701) (2012); 61 Fed. Reg. 69,360 (Dec. 31, 1996);
69 Fed. Reg. 7,121 (Feb. 13, 2004); 73 Fed. Reg. 75,340-75,346 (Dec. 11, 2008); and 78 Fed.
Reg. 66,643-66,648 (Nov. 6, 2013), codified at 40 C.F.R. Part 19.  Under these authorities, the
United States may recover civil penalties of up to $32,500 per day for each violation occurring
between March 16, 2004, and January 12, 2009; and $37,500 per day for each violation
occurring after January 12, 2009.

87.     <u>Relevant State Enforcement Provisions</u>.

a.     Alaska Statute § 46.03.760 authorizes a civil assessment for a violation of Alaska
Statute § 46.14 (Air Quality Control) of not less than $500 nor more than $100,000 for the initial
violation, and not more than $10,000 for each day after that on which the violation continues.

b.     The Washington Clean Air Act, RCW § 70.94.211, authorizes NWCAA to bring a
civil action under RCW § 70.94.431 if NWCAA finds that any person is in violation of any of
the provisions of RCW § 70.94 or any of the rules in force under such chapter, including any
requirement or prohibition of the PSD and NNSR permit programs, an NNSR permit, any NSPS
or NESHAP, Title V of the CAA, a Title V permit, or Title V regulations of the NWCAA.  RCW
§ 70.94.431 authorizes the Court to enjoin violations and to assess and recover civil penalties of
up to $10,000 per day for each violation of the Washington State CAA.  The maximum daily
civil penalty has periodically been increased to account for inflation pursuant to RCW
§ 70.94.431.

c.      Hawaii Revised Statutes (HRS) Section 342B-44 provides, among other things, that the State of Hawaii Director of Health may institute a civil action in any environmental court of competent jurisdiction for injunctive and other relief to prevent any violation of HRS Title 19, Chapter 342B (Hawaii Air Pollution Control Statutes) or any rule adopted or condition of a permit issued pursuant to the Hawaii Air Pollution Control Statutes, to impose and collect civil penalties, or obtain other relief.  HRS § 342B-47(c) provides, among other things, that any person who violates the Hawaii Air Pollution Control Statutes, any rule adopted pursuant to the Hawaii Air Pollution Control Statues, or any condition of a permit issued pursuant to the Hawaii Air Pollution Control Statutes shall be fined not more than $25,000 for each separate offense, with each day of each violation constituting a separate offense.

## V.      FACTUAL ALLEGATIONS UNDERLYING VIOLATIONS

### A.      General Facts

88.      The Defendants' Refineries conduct operations that involve the physical, thermal, and chemical separation of crude oil into marketable petroleum products.  The petroleum refining process employed at the Defendants' Refineries results in emissions of significant quantities of air pollutants, including criteria pollutants and HAPs such as $SO_2$, NOx, PM, CO, VOCs, and benzene.

89.      Each of the Defendants' Refineries is, and at all times relevant herein has been, a "petroleum refinery" within the meaning of NSPS Subparts J, GGG, GGGa, and QQQ, 40 C.F.R. §§ 60.101(a), 60.591, 60.591a, 60.691, and NESHAP Subparts FF and UUU, 40 C.F.R. §§ 61.341 and 63.1561.

90.     Each of the Defendants' Refineries emits or has the potential to emit, and all times relevant herein has emitted or had the potential to emit, more than 100 TPY of NOx, SO$_2$, CO, PM, and VOCs, and more than 25 TPY of HAPs.

**B.     Facts Relevant to Alleged Violations at the Anacortes Refinery**

91.     The Anacortes Refinery is located in Anacortes, Washington, approximately 70 miles north of Seattle.

92.     The Anacortes Refinery produces various petroleum products including gasoline, jet fuel, and diesel fuel and has a total crude oil capacity of about 120,000 barrels per day.

93.     The Anacortes Refinery is, and at all times relevant herein has been, a "major emitting facility," a "stationary source," a "major stationary source," and a "major source" within the meaning of Sections 111, 112, 113, 165, 169, 302(j) and (z), 501 and 502 of the CAA, 42 U.S.C. §§ 7411, 7412, 7475, 7479, 7602(j) and (z), 7661 and 7661a, the PSD Regulations (including 40 C.F.R. § 52.21(b)(1)), NSPS Regulations (including 40 C.F.R. § 60.2), NESHAP Regulations (including 40 C.F.R. § 63.2), federal Title V Program and Regulations, the Washington SIP, NWCAA Title V regulations, other Washington and NWCAA environmental regulations, and other applicable laws, rules, regulations and permits.

94.     The Anacortes Refinery has numerous stationary sources, affected facilities, affected sources, systems, process units, petroleum refining process units, storage vessels, and other equipment that emit air pollutants, regulated NSR pollutants, criteria pollutants, and HAPs. Those relevant to this Complaint include, but are not limited to:

a.     **Various Heaters and Boilers**.  The Anacortes Refinery has various heaters and boilers including a heater known as Heater F-201 which is part of the vacuum unit.  Air emissions from Heater F-201 include NOx and SO2 .

b.    **Wastewater System**.  The Anacortes Refinery wastewater system consists of drains and individual drain systems, sewers, sump pumps, tanks, flotation canals, and other processes to catch wastewater and separate oil from water.  This wastewater system includes benzene-containing hazardous waste treatment, storage, and disposal facilities.  Air emissions from the wastewater system include HAPs and VOCs, including benzene.

c.    **Valves, Pumps and Lines.**  The petroleum refining process units at the Anacortes Refinery contain thousands of valves, pumps, and lines used to move gases, vapors, and liquids. Leaks from this infrastructure result in various air emissions including HAPs and VOCs.

d.    **Flares.**  The Anacortes Refinery has several steam-assisted flares that receive process gasses from refinery operations, which they combust and vent to the atmosphere.  Air emissions from these flares include CO, $SO_2$, $H_2S$, and VOCs.

95.    Defendant Tesoro R&M is, and at all times relevant herein has been, the "owner" and/or "operator" of the Anacortes Refinery and the stationary sources, affected facilities, affected sources, systems, process units, petroleum refining process units, storage vessels and other equipment at the Anacortes Refinery, including those listed in the foregoing paragraph, within the meaning of Sections 111, 112, 113, and 165 of the CAA, 42 U.S.C. §§ 7411, 7412, 7413, 7475, PSD Regulations, NSPS Regulations, NESHAP Regulations, federal Title V Program and Regulations, the Washington SIP, NWCAA Title V regulations, other Washington and NWCAA environmental regulations, and other applicable laws, rules, regulations and permits.

96.    Upon information likely to be discovered after a reasonable opportunity for further investigation and discovery, at times relevant herein, Defendant Tesoro Logistics has

owned and/or operated one or more of the benzene-containing hazardous waste treatment, storage, and disposal facilities at the Anacortes Refinery.

97.     On June 7, 2007, NWCAA issued a construction permit to Defendant Tesoro R&M for the Anacortes Refinery (OAC 989) under NWCAA Section 300 (which was subsequently modified on March 3, 2009 as OAC 989a) for the construction of a selective hydrogenation unit at the facility.  OAC 989 requires a leak detection and repair program using the leak definitions under NSPS Subpart GGGa, 40 C.F.R. § 60.590a-593a.

98.     Since on or about 2002, the Anacortes Refinery has been subject to an NWCAA-issued Title V permit (Anacortes AOP), which has been amended and revised from time to time.

**C.     Facts Relevant to Alleged Violations at the Kapolei Refinery**

99.     The Kapolei Refinery is located in Kapolei, Hawaii, on the island of Oahu, about 20 miles west of Honolulu.

100.     The Kapolei Refinery produces various petroleum products including gasoline, jet fuel, diesel, and fuel oil; and has a total crude oil capacity of about 94,000 barrels per day.

101.     The Kapolei Refinery is, and at all times relevant herein has been, a "major emitting facility," a "stationary source," a "major stationary source," and a "major source" within the meaning of Sections 111, 112, 113, 165, 169, 302(j) and (z), 501 and 502 of the CAA, 42 U.S.C. §§ 7411, 7412, 7475, 7479, 7602(j) and (z), 7661 and 7661a, the PSD Regulations (including 40 C.F.R. § 52.21(b)(1)), NSPS Regulations (including 40 C.F.R. § 60.2), NESHAP Regulations (including 40 C.F.R. § 63.2), federal Title V Program and Regulations, Hawaii SIP and FIP, Hawaii Title V regulations, other Hawaii environmental regulations, and other applicable laws, rules, regulations, and permits.

102.    The Kapolei Refinery has numerous stationary sources, affected facilities, affected sources, systems, process units, petroleum refining process units, storage vessels, and other equipment that emit air pollutants, including regulated NSR pollutants, criteria pollutants, and HAPs.  Those relevant to this Complaint include, but are not limited to:

      a.    **Heaters and Boilers**.  The Kapolei Refinery has numerous heaters and boilers that burn fuel gas and other fuels to transfer heat indirectly or produce steam or hot water used in various refinery operations.  Air emissions from these heaters and boilers include NOx and $SO_2$.

      b.    **Sulfur Recovery Plant**.  The Kapolei Refinery has a Claus Sulfur Recovery Plant (Kapolei SRP) that uses both a thermal and chemical process to convert hydrogen sulfide into elemental sulfur.  Air emissions from the Kapolei SRP include $SO_2$ and HAPs.

      c.    **Wastewater System**.  The Kapolei Refinery wastewater system consists of drains, sewers, sump pumps, tanks, flotation canals, and other processes to catch wastewater and separate oil from water.  Air emissions from the Kapolei wastewater system include VOCs and HAPs, including benzene.

      d.    **Valves, Pumps, and Lines**.  The petroleum refining process units at the Kapolei Refinery contain numerous valves, pumps, and lines used to move gases, vapors, and liquids.  Leaks from this infrastructure result in various air emissions including VOCs and HAPs.

      e.    **Storage Vessels**.  The Kapolei Refinery has multiple storage vessels that hold petroleum products and other liquids such as crude oil, naptha, gasoline, recovered oil, and wastewater.  Storage vessels at the Kapolei Refinery include (as identified in the Kapolei Title V Permit by identification number, stored liquid, and roof type):  Tank 106 (crude oil with an

external floating roof), Tank 107 (crude oil with an external floating roof), Tank 110 (recovered

oil or wastewater with an external floating roof), Tank 202 (naphtha or gasoline with an external

floating roof), Tank 204 (naphtha or gasoline with an external floating roof), Tank 405 (naphtha

or gasoline with an external floating roof), Tank 510 (naphtha or gasoline with an internal

floating roof), Tank 611 (naphtha or gasoline with an internal floating roof), and Tank 3526

(recovered oil or wastewater with an external floating roof).  Air emissions from these vessels

include VOCs and HAPs, including benzene.

       f.     **Flares**.  The Kapolei Refinery has one steam-assisted refinery flare

(Kapolei Flare) that receives process gasses from refinery operations, which it combusts and

vents to the atmosphere.  Air emissions from the Kapolei Flare include CO, $H_2S$, $SO_2$, and

VOCs.

103.    Defendant Par is, and at all times relevant herein has been, the "owner" and/or

"operator" of the Kapolei Refinery and the stationary sources, affected facilities, affected

sources, systems, process units, petroleum refining process units, storage vessels, and other

equipment at the Kapolei Refinery, including those listed in the foregoing paragraph, within the

meaning of Sections 111, 112, 113, and 165 of the CAA, 42 U.S.C. §§ 7411, 7412, 7413, 7475,

the PSD Regulations, NSPS Regulations, NESHAP Regulations, federal Title V Program and

Regulations, Hawaii SIP and FIP, Hawaii Title V regulations, other Hawaii environmental

regulations, and other applicable laws, rules, regulations, and permits.  Defendant Par has been

the "owner" and/or "operator" of the Kapolei Refinery under the following names:  Hawaiian

Independent Refinery, Inc. (early 1970s through 1993), BHP Petroleum Americas Refining, Inc.

(1993 through 1998), Tesoro Hawaii Corporation (1998 through 2013), and Hawaii Independent

Energy, LLC (2013 through 2015).

104.     Since on or about 2000, the Kapolei Refinery has been subject to a Title V permit issued by the Hawaii Department of Health (Kapolei Title V Permit), which has been amended and revised from time to time.

**D.     Facts Relevant to Alleged Violations at the Kenai Refinery**

105.     The Kenai Refinery is located in the Kenai Peninsula Borough, Alaska, approximately 70 miles southwest of Anchorage.

106.     The Kenai Refinery produces various petroleum products including gasoline and gasoline blendstocks, jet fuel, diesel fuel, heating oil and heavy fuel oils, propane, and asphalt and has a total crude oil capacity of about 72,000 barrels per day.

107.     The Kenai Refinery is, and at all times relevant herein has been, part of a "major emitting facility," a "stationary source," a "major stationary source," and a "major source" within the meaning of Sections 111, 112, 113, 165, 169, 302(j) and (z), 501 and 502 of the CAA, 42 U.S.C. §§ 7411, 7412, 7475, 7479, 7602(j) and (z), 7661 and 7661a, the PSD Regulations (including 40 C.F.R. § 52.21(b)(1)), NSPS Regulations (including 40 C.F.R. § 60.2), NESHAP Regulations (including 40 C.F.R. § 63.2), federal Title V Program and Regulations, the Alaska SIP, Alaska Title V regulations, other Alaska environmental regulations, and other applicable laws, rules, regulations and permits.

108.     The Kenai Refinery has numerous stationary sources, affected facilities, affected sources, systems, process units, petroleum refining process units, storage vessels, and other equipment that emit air pollutants, regulated NSR pollutants, criteria pollutants and HAPs. Those relevant to this Complaint include, but are not limited to:

a.     **Process Units and Heaters and Boilers**.  The Kenai Refinery has numerous process units that produce different types of petroleum products using various combinations of

heat, pressurization, and catalysts.  The process units at the Kenai Refinery include, but are not limited to:  the Crude Unit, Vacuum Unit, Hydrocracker Unit, PRIP Unit, DIB Unit, Diesel Desulfurization Unit, Reformer Unit, SCOT Tail gas burner pilot, LPG Unit, air strippers, various engines, and multiple heaters and boilers that provide heat needed in the processes.  Air emissions from these units include NOx, $SO_2$, $H_2S$, PM, CO, VOCs, and HAPs.

       b.    **The Sulfur Recovery Unit (Kenai SRU)**.  The Kenai SRU takes hydrogen sulfide ($H_2S$) that has been removed from other refinery processes and converts it into elemental sulfur.  Air emissions from the Kenai SRU include $SO_2$, $H_2S$, and NOx.

       c.    **Refinery Fuel Gas System**.  The Refinery Fuel Gas System (Kenai RFGS) consists of piping and control system that gathers gaseous streams generated by the Kenai Refinery's operations (including any that are blended with other sources of gas) and uses them as a fuel source for the Kenai Refinery's heaters and boilers.  Air emissions from the Kenai RFGS include CO, $SO_2$, $H_2S$, NOx, VOCs, and PM.

       d.    **Wastewater System**.  The refinery wastewater system consists of drains and individual drain systems, sewers, sump pumps, tanks, flotation canals, a desulfurization unit, and oil-water separators that catch wastewater and separate oil from water.  Oil is returned to the process, and cleaned water is discharged into the waters of Cook Inlet, Alaska.  Air emissions from the Kenai Refinery wastewater system include VOCs and HAPs, including benzene.

       e.    **Valves, Pumps and Lines**.  Process units and petroleum refining process units at the Kenai Refinery contain miscellaneous equipment, valves, pumps, and lines used to move gases, vapors, and liquids.  Leaks from this infrastructure result in air emissions including HAPs and VOCs.

f.      **Turbine Power Generation.**  The refinery has two stationary gas turbines to produce power.  Air emissions from these stationary gas turbines include NOx and $SO_2$.

g.      **Tank Farm.**  The tank farm stores incoming crude oil, various petroleum products produced at the refinery, and is used in the separation of oil and water mixtures**.**  Air emissions from the Kenai tank farm include VOCs and HAPs, including benzene.

h.      **Flares**.  The Kenai Refinery operates two flares, primarily as safety devices to dispose of process upset gases.  The primary flare (Kenai Refinery Flare) is an air-assisted flare that receives gases from various processes from refinery operations, which it combusts and vents to the atmosphere.  The Kenai SRU has a dedicated flare that receives $H_2S$ rich gases from the SRU in the event of a process upset or startup/shutdown of the SRU.  Air emissions from these flares include CO, $SO_2$, $H_2S$, and VOCs.

109.    Defendant Tesoro Alaska is, and at all times relevant herein has been, the "owner" and/or "operator" of the Kenai Refinery and the stationary sources, affected facilities, affected sources, systems, process units, petroleum refining process units, storage vessels, and other equipment at the Kenai Refinery, including those listed in the foregoing paragraph, within the meaning of Sections 111, 112, 113, and 165 of the CAA, 42 U.S.C. §§ 7411, 7412, 7413, 7475, PSD Regulations, NSPS Regulations, NESHAP Regulations, federal Title V Program and Regulations, the Alaska SIP, Alaska Title V regulations, other Alaska environmental regulations, and other applicable laws, rules, regulations and permits.

110.    Since on or about 2003, the Kenai Refinery has been subject to an ADEC-issued Title V permit (Kenai Refinery AOP), which has been amended and revised from time to time.

**E.**     **Facts Relevant to Alleged Violations at the Mandan Refinery**

111.     The Mandan Refinery is located in Mandan, North Dakota which is ten miles west of Bismarck, North Dakota.

112.     The Mandan Refinery manufactures gasoline, diesel fuel, jet fuel, heavy fuel oils, and liquefied petroleum gas and has a capacity of about 71,000 barrels per day.

113.     The Mandan Refinery is, and at all times relevant herein has been, a "major emitting facility," a "stationary source," a "major stationary source," and a "major source" within the meaning of Sections 111, 112, 113, 165, 169, 302(j) and (z), 501 and 502 of the CAA, 42 U.S.C. §§ 7411, 7412, 7475, 7479, 7602(j) and (z), 7661 and 7661a, the PSD Regulations (including 40 C.F.R. § 52.21(b)(1)), NSPS Regulations (including 40 C.F.R. § 60.2); NESHAP Regulations (including 40 C.F.R. § 63.2), federal Title V Program and Regulations, the North Dakota SIP, North Dakota Title V regulations, other North Dakota environmental regulations, and other applicable laws, rules, regulations and permits.

114.     The Mandan Refinery has numerous stationary sources, affected facilities, affected sources, systems, process units, petroleum refining process units, storage vessels, and other equipment that emit air pollutants, regulated NSR pollutants, criteria pollutants and HAPs. Relevant to this Complaint, the Mandan Refinery has steam-assisted flares that receive process gasses from refinery operations, which they combust and vent to the atmosphere.  Air emissions from these flares include CO, $H_2S$, $SO_2$, and VOCs.

115.     Defendant Tesoro R&M is, and at all times relevant herein has been, the "owner" and/or "operator" of the Mandan Refinery and the flares at the Mandan Refinery within the meaning of Sections 111, 112, 113, and 165 of the CAA, 42 U.S.C. §§ 7411, 7412, 7413, 7475, PSD Regulations, NSPS Regulations, NESHAP Regulations, federal Title V Program and

Regulations, the North Dakota SIP, North Dakota Title V regulations, other North Dakota environmental regulations, and other applicable laws, rules, regulations and permits.

**F.     Facts Relevant to Alleged Violations at the Martinez Refinery**

116.    The Martinez Refinery is located in Martinez, California, which is approximately 35 miles north of San Francisco, California.

117.    The Martinez Refinery produces various petroleum products including gasoline, diesel, fuel oil, and has a total crude oil capacity of about 166,000 barrels per day.

118.    The Martinez Refinery is located in a designated Non-Attainment area for ozone. 40 C.F.R. § 81.305.  The BAAQMD SIP-approved NNSR permit rule addresses ozone pollution by addressing precursor organic compounds (POCs), which are compounds that are precursors to ozone.

119.    The Martinez Refinery is, and at all times relevant herein has been, a "major emitting facility," a "stationary source," a "major stationary source," and a "major source" within the meaning of Sections 111, 112, 113, 165, 169, 302(j) and (z), 501 and 502 of the CAA, 42 U.S.C. §§ 7411, 7412, 7475, 7479, 7602(j) and (z), 7661 and 7661a, the PSD Regulations (including 40 C.F.R. § 52.21(b)(1)), NSPS Regulations (including 40 C.F.R. § 60.2), NESHAP Regulations (including 40 C.F.R. § 63.2), federal Title V Program and Regulations, the California SIP and FIP, BAAQMD rules, and other applicable laws, rules, regulations, and permits.

120.    The Martinez Refinery has numerous stationary sources, affected facilities, affected sources, systems, process units, petroleum refining process units, storage vessels, flares, and other equipment that emit air pollutants, regulated NSR pollutants, criteria pollutants, and HAPs.  Those relevant to this Complaint include, but are not limited to:

a.    **Various Heaters and Boilers.**  The Martinez Refinery has numerous heaters and boilers that burn fuel gas and other fuels to transfer heat indirectly or produce steam or hot water used in various refinery operations.  Air emissions from these heaters and boilers include NOx and $SO_2$.

b.    **Delayed Coker**.  The Martinez Refinery has a delayed coker (Martinez Delayed Coker) in which high molecular weight petroleum derivatives are thermally cracked and petroleum coke is produced in a series of closed, batch system reactors.  Air emissions from the delayed coker at the Martinez Refinery include $H_2S$ and POCs.

c.    **Fluid Catalytic Cracking Unit (Martinez FCCU)**.  The Martinez FCCU, including its associated CO Boiler, converts the high-boiling, high-molecular weight hydrocarbon fractions of petroleum crude oils to more valuable gasoline, olefinic gases, and other products.  Air emissions from the FCCU include $SO_2$, CO, and $NO_x$.

d.    **Sulfuric Acid Plant (Martinez SAP).**  The Martinez SAP produces sulfuric acid by the contact process by burning spent acid from the alkylation plant, $H_2S$ from diethanolamine unit strippers, sulfuric acid from the Martinez SAP, or gas vented from the sulfur recovery plant sulfur pits.  Air emissions from the Martinez SAP include $SO_2$ and sulfuric acid mist.

e.    **Flares.**  The Martinez Refinery has numerous flares that receive process gasses from refinery operations, which they combust and vent to the atmosphere.  These flares include steam-assisted, air-assisted, and unassisted flares.  Air emissions from these flares include CO, $H_2S$, $SO_2$, VOCs, and POCs.

121.    Since about 2002, Defendant Tesoro R&M has been, and continues to be, the "owner" and/or "operator" of the Martinez Refinery and the stationary sources, affected

facilities, affected sources, systems, process units, petroleum refining process units, storage vessels, and other equipment at the Martinez Refinery, including those listed in the foregoing paragraph, within the meaning of Sections 111, 112, 113, and 165 of the CAA, 42 U.S.C. §§ 7411, 7412, 7413, 7475, the PSD Regulations, NSPS Regulations, NESHAP Regulations, federal Title V Program and Regulations, California SIP and FIP, BAAQMD rules, other environmental regulations, and other applicable laws, rules, regulations, and permits.

122.    Since on or about 2003, the Martinez Refinery has been subject to a BAAQMD-issued Title V permit (Martinez Title V Permit), which has been amended and revised from time to time.

**G.    Facts Relevant to Alleged Violations at the SLC Refinery**

123.    The SLC Refinery is located in Salt Lake City, Utah.

124.    The SLC Refinery produces various petroleum products including gasoline, diesel fuel, jet fuel, heavy fuel oils, and liquefied petroleum gas, and has a total crude oil capacity of about 58,000 barrels per day.

125.    The SLC Refinery is, and at all times relevant herein has been, a "major emitting facility," a "stationary source," a "major stationary source," and a "major source" within the meaning of Sections 111, 112, 113, 165, 169, 302(j) and (z), 501 and 502 of the CAA, 42 U.S.C. §§ 7411, 7412, 7475, 7479, 7602(j) and (z), 7661 and 7661a, the PSD Regulations (including 40 C.F.R. § 52.21(b)(1)), NSPS Regulations (including 40 C.F.R. § 60.2), NESHAP Regulations (including 40 C.F.R. § 63.2), federal Title V Program and Regulations, the Utah SIP, Utah Title V regulations, other Utah environmental regulations, and other applicable laws, rules, regulations and permits.

126. The SLC Refinery has numerous stationary sources, affected facilities, affected sources, systems, process units, refining process units, flares, and other equipment that emit air pollutants, regulated NSR pollutants, criteria pollutants, and HAPs.  Those relevant to this Complaint include, but are not limited to:

a.   **Fluid Catalytic Cracking Unit (SLC FCCU).**  The SLC FCCU converts the high-boiling, high-molecular weight hydrocarbon fractions of petroleum crude oils to more valuable gasoline, olefinic gases, and other products.  Air emissions from the SLC FCCU include $SO_2$, CO, and $NO_x$.

b.   **Flares.**  The SLC Refinery has two steam-assisted flares that receive process gasses from various refinery operations, which they combust and vent to the atmosphere. Air emissions from these flares include CO, $H_2S$, $SO_2$, and VOCs.

127. Defendant Tesoro R&M is, and at all times relevant herein has been, the "owner" and/or "operator" of the SLC Refinery and the stationary sources, affected facilities, affected sources, systems, process units, petroleum refining process units, storage vessels, and other equipment at the SLC Refinery, including those listed in the foregoing paragraph, within the meaning of Sections 111, 112, 113, and 165 of the CAA, 42 U.S.C. §§ 7411, 7412, 7413, 7475, PSD Regulations, NSPS Regulations, NESHAP Regulations, federal Title V Program and Regulations, the Utah SIP, Utah Title V regulations, other Utah environmental regulations, and other applicable laws, rules, regulations and permits.

**H.**   **Facts Relevant to Alleged Flaring Violations at All Refineries**

128. As set forth above, there are numerous flares at Defendants' Refineries (Defendants' Flares).  Defendants' Flares are used to control emissions from stationary sources, affected facilities, affected sources, process units, refining process units, and equipment at

United States, et al. v. Tesoro, et al. Complaint                                                                    Page 40.

Defendants' Refineries, including emissions resulting from malfunctions and pressure relief episodes.

129.    Defendants' Flares are open-air combustion devices that serve as safety devices to destroy waste gas that results from sudden, infrequent, and not reasonably preventable malfunctions of process equipment.  Flares also are used as pollution control devices for waste gases that contains VOCs or HAP compounds.  A properly operating flare combusts the VOCs and HAPs into water and carbon dioxide.

130.    Defendants' Flares use a specially designed burner tip, auxiliary fuel, and may use steam or air as an assist medium to promote mixing with the goal of nearly complete destruction of CO, VOCs, HAPs, $SO_2$, and $H_2s$ and thus prevent such material from being emitted into the air.  However, in the course of flaring some pollutants are nonetheless emitted into the air.

131.    Two key practices can result in excess pollution from flares:  too much waste gas being sent to flares and over-steaming of flares.  At times, refineries send waste gases to flares that are generated, not by emergencies, but by routine or preventable circumstances.  In addition, when too much steam is injected into a flare, the heating value of the waste gas in the flame (i.e., in the combustion zone) can become low, combustion can be incomplete, and unburned VOCs and HAPs can be emitted.  There are practices and equipment that can minimize the quantity of waste gas directed to flares (flare minimization) and can increase efficiency of the combustion so that a greater percentage of VOCs and HAPs in the waste gas sent to the flares is transformed into carbon dioxide or water (flare combustion efficiency).

132.    Upon information likely to be discovered upon a reasonable opportunity for investigation and discovery, each of Defendants' Flares, are, and at all times relevant to this Complaint have been, a "stationary source," a "major stationary source," and a "major source"

"affected facility" and "affected source" within the meaning of Sections 111(a), 112(a), 165, 173, 302(z), 501, 502 of the CAA, 42 U.S.C. §§ 7411(a), 7412(a), 7475, 7503, 7602(z), 7661, 7661a, and the PSD Regulations, NNSR Regulations, NSPS Regulations, NESHAP Regulations, AIPs, federal Title V Program and Regulations, and the corresponding state Title V regulations, other environmental regulations, and other applicable laws, regulations and permits.

## FIRST CLAIM FOR RELIEF

**Claim by the United States and NWCAA for Violations of NSPS Subpart J
and NWCAA Regulations for Burning Fuel Containing H$_2$S
Exceeding the Applicable Limit
in Heater F-201 at the Anacortes Refinery**

133.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

134.    Heater F-201 at the Anacortes Refinery is, and at all relevant times has been, an FGCD within the meaning of 40 C.F.R. § 60.101(g), that was constructed, reconstructed or modified after June 11, 1973, and before May 14, 2007, within the meaning of 40 C.F.R. §§ 60.2 and 60.100(a).  As such, Heater F-201 is an "affected facility" at a "stationary source" within the meaning of 40 C.F.R. §§ 60.1, 60.2 and 60.100(a), and is subject to the requirements of NSPS Subpart J, 40 C.F.R. § 100 *et seq.*

135.    At all times relevant herein, NSPS Subpart J and NWCAA Regulations have prohibited Defendant Tesoro R&M from burning in any FGCD any fuel gas containing H$_2$S in excess of 230 milligrams per dry standard cubic meter (mg/dscm) (or 0.10 grams per dry standard cubic foot (gr/dscf).  40 C.F.R. § 60.104(a)(1); NWCAA Regulations Section 104.2.

136.    On multiple occasions since 1986, Defendant Tesoro R&M burned refinery fuel gas containing H$_2$S in excess of 230 mg/dscm in Heater F-201 at the Anacortes Refinery, in violation of NSPS Subpart J, 40 C.F.R. § 60.104(a)(1), and NWCAA Regulations Section 104.2.

137.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

138.     As a result of the above-listed violations, pursuant to RCW § 70.94.431, Defendant Tesoro R&M is liable for a permanent or temporary injunction and/or the assessment of a civil penalty of up to $13,000 per violation per day for each violation that occurs between July 14, 2001, and July 9, 2003, inclusive, up to $14,000 per violation per day for each violation that occurs between July 10, 2003, and July 13, 2005, inclusive, up to $14,500 per violation per day for each violation that occurs between July 14, 2005, and November 7, 2007, inclusive, and up to $15,500 per violation per day for each violation that occurs after November 8, 2007.

## SECOND CLAIM FOR RELIEF

**Claim by the United States and NWCAA
for Violations of NSPS Subparts A and J and NWCAA Regulations
for Failure to Submit Periodic Reports
Regarding Heater F-201 at the Anacortes Refinery**

139.     Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

140.     Heater F-201 at the Anacortes Refinery is, and at all relevant times has been, an FGCD within the meaning of 40 C.F.R. § 60.101(g), that was constructed, reconstructed or modified after June 11, 1973, and before May 14, 2007, within the meaning of 40 C.F.R. §§ 60.2 and 60.100(a).  As such, Heater F-201 is an "affected facility" at a "stationary source" and at a "petroleum refinery" within the meaning of 40 C.F.R. §§ 60, 60.2, § 60.100(a), and is subject to the requirements of NSPS Subpart J, 40 C.F.R. § 100 *et seq.*

141.    At all times relevant herein, NSPS Subparts A and J and NWCAA Regulations require Defendant Tesoro R&M to submit periodic reports with all of the data on Heater F-201 received from continuous monitoring systems and other measurements obtained by supplemental sampling.  40 C.F.R. §§ 60.07, 60.107; NWCAA Regulations Section 104.2.

142.    On multiple occasions since 1986, Defendant Tesoro R&M failed to submit periodic reports on Heater F-201, as required by NSPS Subparts A and J, 40 C.F.R. §§ 60.07, 60.107, and NWCAA Regulations Section 104.2.

143.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

144.    As a result of the above-listed violations, pursuant to RCW § 70.94.431, Defendant Tesoro R&M is liable for a permanent or temporary injunction and/or the assessment of a civil penalty of up to $13,000 per violation per day for each violation that occurs between July 14, 2001, and July 9, 2003, inclusive, up to $14,000 per violation per day for each violation that occurs between July 10, 2003, and July 13, 2005, inclusive, up to $14,500 per violation per day for each violation that occurs between July 14, 2005, and November 7, 2007, inclusive, and up to $15,500 per violation per day for each violation that occurs after November 8, 2007.

## THIRD CLAIM FOR RELIEF

### Claim by the United States and NWCAA
### for Violations of the NESHAP Subpart FF
### and the Anacortes AOP Relating to Benzene Waste Streams
### at the Anacortes Refinery

145.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully

set forth herein.

146.    At all times relevant herein, the Anacortes Refinery has had benzene-containing

hazardous waste treatment, storage, and disposal facilities that treat, store, or dispose of

hazardous waste generated at the Anacortes Refinery within the meaning NESHAP Subpart FF,

40 C.F.R. § 61.340 that are subject to the requirements of NESHAP Subpart FF, 40 C.F.R.

§ 61.340 *et seq.*

147.    At all times relevant herein, NESHAP Subpart FF and the Anacortes AOP have

required Defendants Tesoro R&M and Tesoro Logistics to determine and submit in a Total

Annual Benzene (TAB) report, the annual waste quantity of benzene for each waste stream at the

Anacortes Refinery.  40 C.F.R. § 61.355(a)(1)(i); Anacortes AOP Condition 4.23; Anacortes

AOP Condition 5.10.1 (2010 renewal).

148.    On numerous occasions since 2000, Defendants Tesoro R&M and Tesoro

Logistics failed to include the contributions from several wastewater streams in its TAB reports,

in violation of 40 C.F.R. § 61.355(a)(1)(i), Anacortes AOP Condition 4.23, and Anacortes AOP

Condition 5.10.1 (2010 renewal).

149.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA,

42 U.S.C. § 7413(b), Defendants Tesoro R&M and Tesoro Logistics are liable for injunctive

relief and the assessment of civil penalties of not more than $32,500 per violation per day for

each violation that occurred after March 15, 2004, through January 12, 2009, and not more than

$37,500 per violation per day for each violation that occurred after January 12, 2009.

150.     As a result of the above-listed violations, pursuant to RCW § 70.94.431,

Defendant Tesoro R&M is liable for a permanent or temporary injunction and/or the assessment

of a civil penalty of up to $13,000 per violation per day for each violation that occurs between

July 14, 2001, and July 9, 2003, inclusive, up to $14,000 per violation per day for each violation

that occurs between July 10, 2003, and July 13, 2005, inclusive, up to $14,500 per violation per

day for each violation that occurs between July 14, 2005, and November 7, 2007, inclusive, and

up to $15,500 per violation per day for each violation that occurs after November 8, 2007.

### FOURTH CLAIM FOR RELIEF

**Claim by the United States and NWCAA
for Violations of LDAR Requirements
at the Anacortes Refinery**

151.     Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully

set forth herein.

152.     The Anacortes Refinery has, and at all relevant times herein has had, numerous

"petroleum refining process units" with "emission points" within the meaning of NESHAP

Subpart CC, 40 C.F.R. § 63.641.  As such, these petroleum refining process units at the

Anacortes Refinery are "affected sources" within the meaning of NESHAP Subpart CC,

40 C.F.R. § 63.641, and are subject to the requirements of NESHAP Subpart CC, 40 C.F.R.

§ 63.640 *et seq.*

153.     At all times relevant herein, the Anacortes AOP has required that Defendant

Tesoro R&M comply with NESHAP Subpart CC at the Anacortes Refinery.  *See, e.g.*, Anacortes

AOP Conditions 5.1.3, 5.1.4, 5.1.6, 5.1.10, 5.1.11, 5.1.12, 5.1.13, 5.1.14, 5.1.15, 5.1.16, 5.1.17,

5.1.18, 5.1.19, 5.1.20, 5.2.1, 5.3.2, 5.4.4, 5.6.20, 5.6.78, 5.8.1, 5.8.2, 5.8.3, 5.8.4, 5.8.5, 5.8.8, 5.8.11, 5.8.12, 5.8.13, 5.8.14, 5.8.15, 5.8.16, 5.8.17; Anacortes AOP Conditions 5.1.1, 5.2.1, 5.4.1, 5.5.1, 5.7.1, 5.9.1, 5.9.2, 5.9.3, 5.9.4, 5.9.5, 5.9.10, 5.9.11, 5.9.13, 5.9.14, 6.2 (2010 renewal).

154.    At all times relevant herein, NESHAP Subpart CC has required that Defendant Tesoro R&M comply with NESHAP Subpart VV (40 C.F.R. § 60.480 *et seq.*) at the Anacortes Refinery.  40 C.F.R. § 63.648.

155.    At all times relevant herein, NESHAP Subpart CC, the Anacortes AOP, and OAC 989 have required Defendant Tesoro R&M to attempt to repair leaks in valves in gas/vapor service or light liquid service at the Anacortes Refinery within 5 days.  40 C.F.R. § 63.640 (requiring compliance with NSPS Subpart VV, 40 C.F.R. § 60.482-7(d)(2)); AOP Condition 5.1.6, 5.1.16, 5.2.1, 5.3.2, 5.4.4, 5.6.20, 5.6.78, 5.10.8; Anacortes AOP Condition 5.1.1, 5.2.1, 5.4.1, 5.5.1, 5.7.1, 5.9.1, 6.2.9 (2010 renewal); OAC 989.

156.    At all times relevant herein, NESHAP Subpart CC,  the Anacortes AOP, and OAC 989 has required Defendant Tesoro R&M to repair leaks in pumps in light liquid service within 15 days and to inspect the repair to ensure the leak is eliminated.  40 C.F.R. § 63.648 (requiring compliance with NSPS Subpart VV, 40 C.F.R. § 60.482-2(c)(1)); Anacortes AOP Condition 5.1.6, 5.1.10, 5.2.1, 5.3.2, 5.4.4, 5.6.20, 5.6.78, 5.10.1, 5.10.2; Anacortes AOP Conditions 5.1.1, 5.2.1, 5.4.1, 5.5.1, 5.7.1, 5.9.1, 6.2.1, 6.2.25.6.80 (2010 renewal); OAC 989.

157.    At all times relevant herein, the Anacortes AOP has required Defendant Tesoro R&M to report deviations from the AOP requirements set forth in the foregoing paragraph. Anacortes AOP Condition 2.4.5; Anacortes AOP Condition 2.4.6 (2010 renewal).

158.    In 2008, Defendant Tesoro R&M failed to attempt to repair leaks in numerous valves in gas/vapor service or light liquid service within 5 days, in violation of NESHAP Subpart CC, 40 C.F.R. § 63.648 (requiring compliance with NSPS Subpart VV, 40 C.F.R. § 63.482-7(d)(2)), OAC 989, and Anacortes AOP Conditions 5.1.6, 5.1.16, 5.2.1, 5.3.2, 5.4.4, 5.6.20, 5.6.78, and 5.10.8 (requiring compliance with NESHAP Subpart CC).

159.    In 2008, Defendant Tesoro R&M failed to repair leaks in at least one pump in light liquid service within 15 days and inspect the repair to assure that the leak was eliminated, in violation of NESHAP Subpart CC, 40 C.F.R. § 63.648 (requiring compliance with NSPS Subpart VV, 40 C.F.R. § 60.482-2(c)(1)), OAC 989, and Anacortes AOP Conditions 5.1.6, 5.1.10, 5.2.1, 5.3.2, 5.4.4, 5.6.20, 5.6.78, 5.10.1, 5.10.2 (requiring compliance with NESHAP Subpart CC).

160.    In 2008, Defendant Tesoro R&M failed to report deviations from the Anacortes AOP's requirements as described in the preceding Paragraphs 158-159, in violation of Anacortes AOP Condition 2.4.5.

161.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

162.    As a result of the above-listed violations, pursuant to RCW § 70.94.431, Defendant Tesoro R&M is liable for a permanent or temporary injunction and/or the assessment of a civil penalty of up to $13,000 per violation per day for each violation that occurs between July 14, 2001, and July 9, 2003, inclusive, up to $14,000 per violation per day for each violation that occurs between July 10, 2003, and July 13, 2005, inclusive, up to $14,500 per violation per

day for each violation that occurs between July 14, 2005, and November 7, 2007, inclusive, and up to $15,500 per violation per day for each violation that occurs after November 8, 2007.

### FIFTH CLAIM FOR RELIEF

**Claim by the United States and State of Hawaii**
**for PSD Violations Related to $SO_2$ and NOx Emissions Associated with**
**a 1986 to 1991 Capacity Expansion at the Kapolei Refinery**

163.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

164.    Between about 1986 and about 1991, Defendant Par made multiple physical and operational changes to the Kapolei Refinery to increase its crude oil processing capacity (the 1986 to 1991 Capacity Expansion).

165.    The physical and operational changes undertaken as part of the 1986 to 1991 Capacity Expansion constituted one or more "major modifications" of the Kapolei Refinery within the meaning of 40 C.F.R. § 52.21(b)(2), for both $SO_2$ and NOx because:  (a) they are "modifications" within the meaning of Section 169(2)(C) of the CAA, 42 U.S.C. § 7479(2)(C) (incorporating definition of "modification" from 42 U.S.C. § 7411(a)), and 40 C.F.R. § 52.21(b)(2); (b) they resulted in a "significant emissions increase" of $SO_2$ and NOx, within the meaning of 40 C.F.R. § 52.21(b)(23) and (40); and (c) they resulted in a significant "net emissions increase" of $SO_2$ and NOx, within the meaning of 40 C.F.R. § 52.21(b)(3) and (23) (where, in both cases, 40 C.F.R. § 52.21(b)(23) defines "significant" as a rate of emissions that would equal or exceed 40 TPY of $SO_2$ or NOx).

166.    Because the 1986 to 1991 Capacity Expansion constituted one or more "major modifications" for $SO_2$ and NOx, the PSD Program and Regulations required and continue to require that Defendant Par:  (a) undergo a BACT review for $SO_2$ and NOx emissions from

sources modified in the 1986 to 1991 Capacity Expansion; (b) obtain appropriate construction and/or operating permits for the sources modified in the 1986 to 1991 Capacity Expansion; (c) demonstrate that the emissions increases from the 1986 to 1991 Capacity Expansion would not cause or contribute to violations of air quality standards; (d) provide for review and public comment on the air quality impacts of the 1986 to 1991 Capacity Expansion; and (e) comply with BACT emission limits on $SO_2$ and NOx from the sources modified in the 1986 to 1991 Capacity Expansion.  42 U.S.C. § 7475(a); 40 C.F.R. § 52.21.

167.    Defendant Par commenced construction of the 1986 to 1991 Capacity Expansion and has subsequently operated the sources constructed and/or modified as part of the 1986 to 1991 Capacity Expansion without satisfying the requirements listed in (a) through (e) of the foregoing paragraph in violation of the PSD Program and Regulations and AIP (including Section 165 of the CAA, 42 U.S.C. § 7475, and 40 C.F.R. § 52.21).

168.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Par is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

169.    As a result of the above-listed violations and pursuant to HRS § 342B-44, Defendant Par is liable for injunctive relief and/or a fine of up to $25,000 for each separate offense, with each day of each violation constituting a separate offense.

## SIXTH CLAIM FOR RELIEF

**Claim by the United States and State of Hawaii
for Violations of Federal and Hawaii Title V Requirements
with Respect to the 1986 to 1991 Capacity Expansion at the Kapolei Refinery**

170.    Paragraphs 1 through 132 and 164 through 166 are re-alleged and incorporated by reference as if fully set forth herein.

171.    As set forth in Paragraphs 164-166 above, Defendant Par undertook the 1986 to 1991 Capacity Expansion which, as one or more "major modifications," triggered requirements, *inter alia*, to obtain permits requiring compliance with BACT emission limits on $SO_2$ and NOx from the modified sources, and to operate such modified sources in compliance with such BACT emission limits.

172.    At all times relevant herein, the federal Title V Program and Regulations and Hawaii Title V regulations have required and continue to require that Defendant Par submit a Title V permit application with respect to the 1986 to 1991 Capacity Expansion containing: (a) information sufficient to determine all applicable air pollution control requirements (including any requirement to meet the applicable control technology requirements under the PSD Program and Regulations); (b) information that may be necessary to determine the applicability of other applicable requirements of the CAA; (c) a compliance plan for all applicable requirements for which any modified source is not in compliance; and (d) a certification of compliance with all applicable requirements by a responsible official.  42 U.S.C. § 7661b(b)-(c); 40 C.F.R. § 70.5; HAR §§ 11-60.1-83-84.

173.    At all times relevant herein, the federal Title V Program and Regulations and the Hawaii Title V regulations have provided that any permit applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon

becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.  40 C.F.R. § 70.5(b); HAR § 11-60.1-84.

174.    With respect to the 1986 to 1991 Capacity Expansion, Defendant Par failed to submit complete and timely applications for Title V permits, or submit supplementary facts or corrected information for previously submitted Title V permit applications that satisfied the requirements set forth in (a) through (d) of Paragraph 172 above in violation of the federal Title V Program and Regulations and Hawaii Title V regulations (including 40 C.F.R. § 70.5(b) and HAR § 11-60.1-84).

175.    At all times relevant herein, the federal Title V Program and Regulations and Hawaii Title V regulations have provided that no source may operate except in compliance with a Title V permit.  42 U.S.C. § 7661a(a); 40 C.F.R. §§ 70.1(b), 70.7(b); HAR § 11-60.1-82.

176.    Defendant Par operated and continues to operate one or more of the sources modified in the 1986 to 1991 Capacity Expansion without having a valid Title V permit requiring compliance with:  (a) BACT emission limits on $SO_2$ and NOx from the modified sources; or (b) compliance plan for coming into compliance with such BACT emission limits on $SO_2$ and NOx in violation of the federal Title V Program and Regulations and Hawaii Title V regulations (including Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), 40 C.F.R. §§ 70.1(b), 70.7(b), and HAR § 11-60.1-82)).

177.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Par is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

178.    As a result of the above-listed violations and pursuant to HRS § 342B-44,

Defendant Par is liable for injunctive relief and/or a fine of up to $25,000 for each separate

offense, with each day of each violation constituting a separate offense.

### SEVENTH CLAIM FOR RELIEF

**Claim by the United States and State of Hawaii
for Violations of NSPS Subpart J and Kapolei Title V Permit
for Discharging Gasses Containing SO₂ Exceeding the Applicable Limit
at the Kapolei SRP**

179.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully

set forth herein.

180.    The Kapolei SRP includes, but is not limited to, two sulfur recovery units, two

sulfur pits, a tail gas unit, and two tail gas incinerators; has a design capacity for sulfur feed of

more than twenty long tons per day; and is a "Claus sulfur recovery plant" within the meaning of

40 C.F.R. § 60.101(i).  The Kapolei SRP was constructed, reconstructed, or modified between

October 4, 1976, and May 14, 2007, within the meaning of 40 C.F.R. §§ 60.2 and 60.100(b).  As

such, the Kapolei SRP is an "affected facility" at a "stationary source" and "petroleum refinery"

within the meaning of 40 C.F.R. §§ 60.1, 60.2, 60.100(a), and 60.101(a), and subject to the

requirements of NSPS Subpart J, 40 C.F.R. § 60.100 *et seq.*

181.    At all relevant times herein, NSPS Subpart J and the Kapolei Title V Permit

prohibited Defendant Par from discharging from the Kapolei SRP any gas that contains in excess

of 250 ppmv SO₂ at 0% air.  40 C.F.R. § 60.104(a)(2)(i); Kapolei Title V Permit, Attachment

II(H), Section C.3.

182.    On multiple occasions between November of 2007 and September of 2010,

Defendant Par discharged gases into the atmosphere from the Kapolei SRP containing in excess

of 250 ppmv SO$_2$ at 0% air, in violation of NSPS Subpart J, 40 C.F.R. § 60.104(a)(2)(i), and the

Kapolei Title V Permit, Attachment II(H), Section C.3.

183.    As a result of the above-listed violations and pursuant to Section 113(b) of the

CAA, 42 U.S.C. § 7413(b), Defendant Par is liable for injunctive relief and the assessment of

civil penalties of not more than $32,500 per violation per day for each violation that occurred

after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day

for each violation that occurred after January 12, 2009.

184.    As a result of the above-listed violations and pursuant to HRS § 342B-44,

Defendant Par is liable for injunctive relief and/or a fine of up to $25,000 for each separate

offense, with each day of each violation constituting a separate offense.

## EIGHTH CLAIM FOR RELIEF

**Claim by the United States and State of Hawaii
for Violations of NSPS Subparts A and J and the Kapolei Title V Permit
for Failing to Calibrate, Maintain, or Operate Monitoring Systems
at the Kapolei Refinery**

185.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully

set forth herein.

186.    One or more heaters and boilers at the Kapolei Refinery (Kapolei Heaters and

Boilers) are FGCDs within the meaning of 40 C.F.R. § 60.101(g), which were constructed,

reconstructed, or modified after June 11, 1973, and before May 14, 2007, within the meaning of

40 C.F.R. §§ 60.2 and 60.100(b).  As such, each such Kapolei Heater and Boiler is an "affected

facility" at a "stationary source" and at a "petroleum refinery" within the meaning of 40 C.F.R.

§§ 60.1, 60.2, 60.100(a), 60.101(a), and subject to the requirements of NSPS Subparts A and J,

40 C.F.R. §§ 60.1, *et seq.*, 60.100 *et seq.*

187.   The Kapolei SRP includes, but is not limited to, two sulfur recovery units, two sulfur pits, a tail gas unit, and two tail gas incinerators.  The Kapolei SRP has a design capacity for sulfur feed of more than twenty long tons per day and is a "Claus sulfur recovery plant" within the meaning of 40 C.F.R. § 60.101(i), which was constructed, reconstructed, or modified between October 4, 1976, and May 14, 2007, within the meaning of 40 C.F.R. §§ 60.2 and 60.100(b).  As such, the Kapolei SRP is an "affected facility" at a "stationary source" and "petroleum refinery" within the meaning of 40 C.F.R. §§ 60.1, 60.2, 60.100(a), 60.101(a), and subject to the requirements of NSPS Subparts A and J, 40 C.F.R. §§ 60.1 *et seq.*, 60.100 *et seq.*

188.   At all times relevant herein, NSPS Subparts A and J, and the Kapolei Title V Permit have required Defendant Par to install, calibrate, maintain, and continually operate $H_2S$ continuous monitoring systems (CMS) on all FGCDs that are affected facilities including the Kapolei Heaters and Boilers.  40 C.F.R. §§ 60.13(e) and 60.105(a)(3)-(4); Kapolei Title V Permit, Attachment II(A), Section D.1, Attachment II(B), Section D.1, Attachment II(C), Section D.2, Attachment II(D), Section D.2, Attachment II(E), Section D.2, Attachment II(F), Section D.2, Attachment II(G), Section D.2, Attachment II(H), Section D.2, Attachment II(I), Section D.3, Attachment II(J), Section D.3.

189.   On multiple occasions between about March of 2006 and about December of 2010, Defendant Par failed to calibrate, maintain, or operate $H_2S$ CMS on the Kapolei Heaters and Boilers in violation of NSPS Subparts A and J, 40 C.F.R. §§ 60.13(e), 60.105(a)(3)-(4), and the Kapolei Title V Permit Attachment II(A), Section D.1, Attachment II(B), Section D.1, Attachment II(C), Section D.2, Attachment II(D), Section D.2, Attachment II(E), Section D.2, Attachment II(F), Section D.2, Attachment II(G), Section D.2, Attachment II(H), Section D.2, Attachment II(I), Section D.3, Attachment II(J), Section D.3.

190.    At all times relevant herein, NSPS Subparts A and J, and the Kapolei Title V Permit have required Defendant Par to install, calibrate, maintain, and continuously operate $SO_2$ continuous emissions monitoring systems (CEMS) for the Kapolei SRP.  40 C.F.R. §§ 60.13(e), 60.105(a)(5); Kapolei Title V Permit, Attachment II(H), Section D.1.

191.    On multiple occasions between about July of 2006 and about January of 2010, Defendant Par failed to calibrate, maintain, or operate $SO_2$ CEMS for the Kapolei SRP in violation of NSPS Subparts A and J, 40 C.F.R. §§ 60.13(e) and 60.105(a)(5), and the Kapolei Title V Permit, Attachment II(H), Section D.1.

192.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Par is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

193.    As a result of the above-listed violations and pursuant to HRS § 342B-44, Defendant Par is liable for injunctive and/or a fine of up to $25,000 for each separate offense, with each day of each violation constituting a separate offense.

## NINTH CLAIM FOR RELIEF

**Claim by the United States and State of Hawaii
for Violations of NSPS Subpart A
for Failing to Submit Excess Emissions Reports for the Kapolei Flare**

194.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

195.    The flare at the Kapolei Refinery (Kapolei Flare) is a FGCD within the meaning of 40 C.F.R. § 101(g), which was constructed, reconstructed, or modified after June 11, 1973,

and before June 24, 2008, within the meaning of 40 C.F.R. §§ 60.2 and 60.100(b).  As such, the Kapolei Flare is an "affected facility" at a "stationary source" and at a "petroleum refinery" within the meaning of 40 C.F.R. §§ 60.1, 60.2, 60.100(a), and 60.101(a), and subject to the requirements of NSPS Subpart A, 40 C.F.R. § 60.1 *et seq.*

196.    At all times relevant herein, NSPS Subpart A has required Defendant Par to submit an excess emissions and monitoring systems performance report or a summary report form to EPA semiannually with specified information.  40 C.F.R. § 60.7(c).

197.    From about the 1970s through the present, Defendant Par failed to submit periodic excess emissions reports for the Kapolei Flare in violation of NSPS Subpart A, 40 C.F.R. § 60.7(c).

198.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Par is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

199.    As a result of the above-listed violations and pursuant to HRS § 342B-44, Defendant Par is liable for injunctive relief and/or a fine of up to $25,000 for each separate offense, with each day of each violation constituting a separate offense.

## TENTH CLAIM FOR RELIEF

### Claim by the United States and State of Hawaii
### for Violations of Federal and Hawaii Title V Requirements By Failing to Include
### Requirement Regarding Submission of Excess Emission Reports
### in Kapolei Refinery Title V Permit Application

200.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

201.    The Kapolei Flare is a FGCD within the meaning of 40 C.F.R. § 60.101(g), which was constructed, reconstructed, or modified after June 11, 1973, and before June 24, 2008, within the meaning of 40 C.F.R. §§ 60.2 and 60.100(b).  As such, the Kapolei Flare is an "affected facility" at a "stationary source" and a "petroleum refinery" within the meaning of 40 C.F.R. §§ 60.1, 60.2, 60.100(a), and 60.101(a), and subject to the requirements of NSPS Subpart A, 40 C.F.R. 60.1 *et seq.*

202.    At all times relevant herein, NSPS Subpart A has required Defendant Par to submit an excess emissions and monitoring systems performance report or a summary report form to EPA semiannually with specified information.  40 C.F.R. § 60.7(c).

203.    At all times relevant herein, the federal Title V Program and Regulations and Hawaii Title V regulations have required Defendant Par to submit a permit application that, *inter alia*, includes citations and descriptions of all applicable requirements.  42 U.S.C. § 7661b(b)-(c); 40 C.F.R. § 70.5; HAR § 11-60.1-83(a)(7).

204.    Under the federal Title V Program and Regulations and Hawaii Title V regulations, any permit applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information. 40 C.F.R. § 70.5(b); HAR § 11-60.1-84.

205.    Defendant Par failed to submit, and/or supplement and correct previously submitted Title V permit applications, to include citations and descriptions of all applicable requirements, including, but not limited to, the requirement to submit period excess emissions reports for the Kapolei Flare, in violation of the federal Title V Program and Regulations and the

Hawaii Title V regulations (including 40 C.F.R. § 70.5 and HAR §§ 11-60.1-83(a)(7) and 11-60.1-84).

206.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Par is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

207.    As a result of the above-listed violations and pursuant to HRS § 342B-44, Defendant Par is liable for injunctive relief and/or a fine of up to $25,000 for each separate offense, with each day of each violation constituting a separate offense.

## ELEVENTH CLAIM FOR RELIEF

### Claim by the United States and State of Hawaii for Violations of NSPS Subpart Kb and NESHAP Subparts A and CC and the Kapolei Title V Permit for Failing to Maintain Equipment on Storage Vessels at the Kapolei Refinery

208.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

209.    The Kapolei Refinery has, and at all times relevant herein has had, multiple storage vessels (as identified in the Kapolei Title V Permit by identification number, stored liquid, and roof type) including:  Tank 106 (crude oil with an external floating roof), Tank 107 (crude oil with an external floating roof), Tank 110 (recovered oil or wastewater with an external floating roof), Tank 202 (naphtha or gasoline with an external floating roof), Tank 204 (naphtha or gasoline with an external floating roof), Tank 405 (naphtha or gasoline with an external floating roof), Tank 510 (naphtha or gasoline with an internal floating roof), Tank 611 (naphtha

or gasoline with an internal floating roof), and Tank 3526 (recovered oil or wastewater with an external floating roof).

210.    Tank 107, Tank 110, Tank 611, and Tank 3526 are each a "storage vessel" with a capacity greater than or equal to 75 cubic meters that is used to store volatile organic liquids for which construction, reconstruction, or modification commenced after July 23, 1984, within the meaning of 40 C.F.R. §§ 60. 2 and 60.111b.  As such, each such tank is an "affected facility" at a "stationary source" within the meaning of 40 C.F.R. §§ 60.1, 60.2, 60.110b(a), and subject to the requirements of NSPS Subparts A and Kb, 40 C.F.R. §§ 60.1 *et seq.* and 60.110b *et seq.*

211.    Tank 106, Tank 107, Tank 110, Tank 202, Tank 204, Tank 405, Tank 510, and Tank 611 are each a "storage vessel" associated with "petroleum refining process units," within the meaning of 40 C.F.R. § 63.641.  As such, these tanks are part of an "affected source" within the meaning of 40 C.F.R. §§ 63.2 and 63.640(a) and (c), and subject to the requirements of NESHAP Subpart CC, 40 C.F.R. § 63.641 *et seq.*

212.    Tank 106, Tank 107, Tank 110, Tank 202, Tank 204, Tank 405, Tank 510, and Tank 611 are each a "Group 1 storage vessel" within the meaning of NESHAP Subpart CC, 40 C.F.R. § 63.341.

213.    Tank 3526 is a tank containing or contacting a "Group 1 wastewater stream" associated with "petroleum refining process units," within the meaning of 40 C.F.R. § 63.641. As such, Tank 3526 is part of an "affected source" within the meaning of 40 C.F.R. §§ 63.2 and 63.640(a) and (c), and subject to the requirements of NESHAP Subpart CC, 40 C.F.R. § 63.640 *et seq.*

214.    At all times relevant herein, NSPS Subpart Kb, NESHAP Subpart CC, and the Kapolei Title V Permit have required that storage vessels with floating roofs shall float the

floating roofs on the liquid at all times (i.e., off the roof leg supports), with certain exceptions. NSPS Subpart Kb, 40 C.F.R. § 60.112b(a)(2)(iii); NESHAP Subpart CC, 40 C.F.R. § 63.646(a) (requiring compliance with, among other things, NESHAP Subpart G, 40 C.F.R. § 63.119(c)(3)); Kapolei Title V Permit, Attachment II(M), Sections C.7.c.iii and G.1.b.

215.    For Tank 106, in 2007, Defendant Par failed to float the external floating roof on the liquid surface in violation NESHAP Subpart CC, 40 C.F.R. § 63.646(a) (requiring compliance with NESHAP Subpart G, 40 C.F.R. § 63.119) and parallel requirements in the Kapolei Title V Permit, Attachment II(M), Section G.1.b.

216.    For Tank 107, between about January of 2008 and about June of 2008, Defendant Par failed to float the external floating roof on the liquid surface in violation of NSPS Subpart Kb, 40 C.F.R. § 112b(a)(2)(iii)); NESHAP Subpart CC, 40 C.F.R. § 63.640(n); and parallel requirements in the Kapolei Title V Permit Attachment II(M), Section C.7.c.iii.

217.    At all times relevant herein, NSPS Subpart Kb, NESHAP Subpart CC, and the Kapolei Title V Permit have required automatic bleeder vents to be closed at all times when the roof is floating with certain exceptions.  NSPS Subpart Kb, 40 C.F.R. §§ 60.112b(a)(1)(v) (internal floating roofs), 60.112b(a)(2)(ii) (external floating roofs); NESHAP Subpart CC, 40 C.F.R. §§ 63.646(f)(3), 63.647(a) (the latter requiring compliance with, among other things, either NESHAP Subpart FF, 40 C.F.R. § 61.343 or § 61.351, which in turn requires compliance with 40 C.F.R. § 60.112b(a)(1) or (2)); Kapolei Title V Permit, Attachment II(M), Sections B.4, C.7.b.v, and C.7.c.ii.

218.    Between about September of 2008 and May of 2009 for Tank 106, and in 2010 for Tanks 202, 204, and 405, Defendant Par failed to maintain automatic bleeder vents closed at all times when the roof was floating in violation of NESHAP Subpart CC, 40 C.F.R.

§ 63.646(f)(3), and parallel requirements in the Kapolei Title V Permit, Attachment II(M), Section B.4.

219.    For Tank 611, between about June of 2007 and about August of 2007, Defendant Par failed to maintain automatic bleeder vents closed at all times when the internal roof was floating in violation of NSPS Subpart Kb, 40 C.F.R. § 60.112b(a)(1)(v); NESHAP Subpart CC, 40 C.F.R. § 63.640(n); and parallel requirements in the Kapolei Title V Permit Attachment II(M), Section C.7.b.v.

220.    For Tank 3526, between about October of 2006 and February of 2007, Defendant Par failed to maintain automatic bleeder vents closed at all times when the external roof was floating in violation of NSPS Subpart Kb, 40 C.F.R. § 60.112b(a)(2)(ii); NESHAP Subpart CC, 40 C.F.R. § 63.647(a) (incorporating NESHAP Subpart FF incorporating NSPS Subpart Kb, § 60.112b(a)(2)(ii) as an alternative standard); and parallel requirements in the Kapolei Title V Permit, Attachment II(M), Section C.7.c.ii.

221.    At all times relevant herein, NSPS Subpart Kb, NESHAP Subpart CC, and the Kapolei Title V Permit have required that each cover or lid on an opening in a floating roof shall be maintained in a closed position, with certain exceptions.  NSPS Subpart Kb, 40 C.F.R. § 60.112b(a)(2)(ii); NESHAP Subpart CC, 40 C.F.R. §§ 63.646(f)(1) and 63.647(a) (the latter requiring compliance with, among other things, either NESHAP Subpart FF, 40 C.F.R. § 61.343 or § 61.351, which in turn requires compliance with NSPS Subpart Kb, 40 C.F.R. § 60.112b(a)(1) or (2)); Kapolei Title V Permit, Attachment II(M), Sections B.4 and C.7.c.ii.

222.    For Tanks 107 and 110, between about 2007 and 2008, Defendant Par failed to maintain covers or lids on openings in the floating roofs in closed positions in violation of NSPS Subpart Kb, 40 C.F.R. § 60.112b(a)(2)(ii); NESHAP Subpart CC, 40 C.F.R. § 63.640(n); and,

for Tank 110 only, 40 C.F.R. § 63.647(a); and Kapolei Title V, Attachment II(M), Section C.7.c.ii.

223.   For Tank 510, between about August of 2006 and July of 2007, Defendant Par failed to maintain a cover or lid on an opening in the floating roof in a closed position in violation of NESHAP Subpart CC, 40 C.F.R. § 63.646(f)(1) and parallel requirements in the Kapolei Title V Permit, Attachment II(M), Section B.4.

224.   As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Par is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

225.   As a result of the above-listed violations and pursuant to HRS § 342B-44, Defendant Par is liable for injunctive relief and/or a fine of up to $25,000 for each separate offense, with each day of each violation constituting a separate offense.

## TWELFTH CLAIM FOR RELIEF

**Claim by the United States and State of Hawaii
for LDAR Violations
at the Kapolei Refinery**

226.   Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

227.   The Kapolei Refinery has, and at all relevant times herein has had, numerous valves, pumps, and compressors that are associated with "petroleum refining process units" within the meaning of NESHAP Subpart CC, 40 C.F.R. § 63.641.  As such, these valves, pumps, and compressors are part of an "affected source" within the meaning of 40 C.F.R. §§ 63.2 and

63.640(a) and (c), and subject to the requirements of NESHAP Subpart CC, 40 C.F.R. § 63.640 *et seq.*

228.     At all relevant times herein, NESHAP Subpart CC and the Kapolei Title V Permit have required that valves and pumps that are in organic HAP service be monitored for leaks. NESHAP Subpart CC, 40 C.F.R. § 63.348(a) (which requires, among other things, compliance with NSPS Subpart VV, 40 C.F.R. §§ 60.482-2(a)(1) for pumps and 482-7(a)(1) for valves); Kapolei Title V Permit, Attachment II(O), Section B.4.

229.     Between about 2006 and 2010, Defendant Par failed to monitor to detect leaks from more than 2,000 valves and 10 pumps in violation of NESHAP Subpart CC, 40 C.F.R. § 63.648(a) (which requires compliance with NSPS Subpart VV, 40 C.F.R. §§ 60.482-2(a)(1) and 482-7(a)(1)); and Kapolei Title V Permit, Attachment II(O), Section B.4.

230.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Par is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

231.     As a result of the above-listed violations and pursuant to HRS § 342B-44, Defendant Par is liable for injunctive relief and/or a fine of up to $25,000 for each separate offense, with each day of each violation constituting a separate offense.

## THIRTEENTH CLAIM FOR RELIEF

**Claim by the United States and State of Alaska
for Violations of NSPS Subpart J and Kenai Refinery AOP for
Burning Fuel Containing H$_2$S Exceeding the Applicable Limit
at the Kenai Refinery**

232.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

233.    At all times relevant herein, the Kenai Refinery has had 24 process heaters and boilers (identified as Source Ids 2-11, 13, 17-29) (Kenai Heaters and Boilers), which emit air pollutants.

234.    The Kenai Heaters and Boilers are each, and at all times relevant herein have each been, a FGCD within the meaning of 40 C.F.R. § 60.101(g).  Each of the Kenai Heaters and Boilers was constructed, reconstructed, or modified between June 11, 1973 and May 14, 2007 within the meaning of 40 C.F.R. §§ 60.2, 60.100(a).  As such, each of the Kenai Heaters and Boilers is an "affected facility" at a "stationary source" and a "petroleum refinery" within the meaning of 40 C.F.R. §§ 60.1, 60.2, 60.100(a), 60.101(a), and subject to the requirements of NSPS Subpart J, 40 C.F.R. § 60.100 *et seq.*

235.    At all times relevant herein, NSPS Subpart J and the Kenai Refinery AOP have each prohibited Defendant Tesoro Alaska from burning in Kenai Heaters and Boilers any fuel gas containing H$_2$S in excess of 230 milligrams per dry standard cubic meter (mg/dscm) (or 0.10 grams per dry standard cubic foot (gr/dscf)).  40 C.F.R. § 60.104(a)(1); Kenai Refinery AOP Condition 36.

236.    On numerous occasions from October of 2004, through November of 2010, Defendant Tesoro Alaska burned refinery fuel gas containing H$_2$S in excess of 230 mg/dscm (or

0.10 gr/dscf) in numerous of the Kenai Heaters and Boilers, in violation of NSPS Subpart J, 40 C.F.R. § 60.104(a)(1), and Condition 36 of the Kenai Refinery AOP.

237.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

238.    Under Alaska Statute § 46.03.760, for the above-listed violations, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

## FOURTEENTH CLAIM FOR RELIEF

### Claim by the United States and State of Alaska
### for Violations of NSPS Subpart J and the Kenai Refinery AOP for
### Failure to Monitor Fuel Gas H$_2$S at the Kenai Refinery

239.    Paragraphs 1 through 132, and 233 through 234 are re-alleged and incorporated by reference as if fully set forth herein.

240.    As set forth in Paragraphs 233-234 above, the Kenai Heaters and Boilers are each, and at all times relevant herein have each been, a FGCD within the meaning of 40 C.F.R. § 60.101(g), and each was constructed, reconstructed, or modified between June 11, 1973 and May 14, 2007 within the meaning of 40 C.F.R. §§ 60.2, 60.100(a).  As such, each of the Kenai Heaters and Boilers is an "affected facility" at a "stationary source" and a "petroleum refinery" within the meaning of 40 C.F.R. §§ 60.1, 60.2, 60.100(a), 60.101(a) and subject to the requirements of NSPS Subpart J, 40 C.F.R. § 60.100 *et seq.*

241.    The Kenai Refinery Flare is, and at all times relevant to this Complaint has been, a flare and an FGCD within the meaning of 40 C.F.R. §§ 60.100(a) and 101a, which was constructed, reconstructed, or modified between June 11, 1973 and June 24, 2008, within the meaning of 40 C.F.R. §§ 60.2, 60.100(b).  As such, the Kenai Refinery Flare is an "affected facility" at a "stationary source" and at a "petroleum refinery" within the meaning of 40 C.F.R. §§ 60.1, 60.2, 60.100(a), 60.101(a), and subject to requirements of NSPS Subpart J, 40 C.F.R. § 60.100 *et seq.*

242.    At all times relevant herein, NSPS Subpart J and the Kenai Refinery AOP have required Defendant Tesoro Alaska to install, calibrate, operate, and maintain a CEMS of either $SO_2$ emissions into the atmosphere or $H_2S$ in fuel gases before being burned in any FGCD, including the Kenai Heaters and Boilers and Kenai Refinery Flare.  40 C.F.R. § 60.105(a)(3)-(5); Kenai Refinery AOP Condition 36.  Except for system breakdowns, repairs, calibration checks, and zero and span adjustments, all CEMS must be in continuous operation.  40 C.F.R. § 60.13(e); Kenai Refinery AOP Condition 36.  These requirements also specify methods of calibrating and testing CEMS.  40 C.F.R. § 60.105(a)(3), (4); Kenai Refinery AOP Condition 36.

243.    On numerous occasions from February of 2005, through July of 2009, Defendant Tesoro Alaska failed to install, calibrate, operate, and maintain a CEMS of either $SO_2$ emissions into the atmosphere or $H_2S$ in fuel gases for one or more of the Kenai Heaters and Boilers in violation of NSPS Subpart J, 40 C.F.R. § 60.105(a), and the Kenai Refinery AOP Condition 36.

244.    From 1981, through December of 2007, Defendant Tesoro Alaska continuously failed to install a $H_2S$ CEMS on the Kenai Refinery Flare in violation of NSPS Subpart J, 40 C.F.R. § 60.105(a), and the Kenai Refinery AOP Condition 36.

245.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

246.     Under Alaska Statute § 46.03.760, for the above-listed violations, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

## FIFTEENTH CLAIM FOR RELIEF

### Claim by the United States and State of Alaska
for Violations of NSPS Subpart GG and the Kenai Refinery AOP
at the Kenai Refinery

247.     Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

248.     The Kenai Refinery has, and at all times relevant herein has had, two stationary gas turbines (GT-1400 and GT-1410) with a heat input rating of greater than 10.7 gigajoules (10 million BTU) per hour, based on the lower heating value of the fuel fired, which were constructed, reconstructed, or modified after October 3, 1977, within the meaning of 40 C.F.R. §§ 60.2 and 60.330.  As such, each of the stationary gas turbines at the Kenai Refinery is an "affected facility" at a "stationary source" within the meaning of 40 C.F.R. §§ 60.1, 60.2, 60.330, and subject to requirements in NSPS Subpart GG,  40 C.F.R. § 60.330 *et seq.*

249.     At all relevant times herein, NSPS Subpart GG has required that Defendant Tesoro Alaska monitor the total sulfur content of the fuel being fired in each of its stationary gas

turbines according to a custom fuel monitoring schedule to evaluate sulfur content and analyze those samples for the total sulfur content of the fuel using specified American Standard Test Methods (ASTMs) depending on the type of fuel.  40 C.F.R. § 60.334(h)(4), (i)(3).  The Kenai Refinery AOP Condition 35.1 requires that Defendant Tesoro Alaska perform this monitoring once a month.

250.    On numerous occasions from 2005 through 2008, Defendant Tesoro Alaska failed to complete monthly sulfur analyses for LPG and natural gas fired in its stationary gas turbines in violation of Subpart GG, 40 C.F.R. §§ 60.334(h)(4), (i)(3), and the Kenai Refinery AOP Condition 35.1.

251.    From 2003 through February of 2008, Defendant Tesoro Alaska failed to use an approved ASTM for monthly gaseous fuel analysis on its stationary gas turbines fuel samples in violation of NSPS Subpart GG, 40 C.F.R. § 60.334(i)(3), and the Kenai Refinery AOP Condition 35.1.

252.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

253.    Under Alaska Statute § 46.03.760, for the above-listed violations, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

## SIXTEENTH CLAIM FOR RELIEF

### Claim by the United States and State of Alaska
### for Violations of NSPS Subpart QQQ and the Kenai Refinery AOP
### Relating to the Wastewater System at the Kenai Refinery

254.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

255.    The Kenai Refinery has, and at all times relevant herein has had, a wastewater system that consists of individual drain systems and oil-water separators, which were constructed, reconstructed, or modified after May 4, 1987, within the meaning of 40 C.F.R. §§ 60.2, 60.690-91.  These include Slop Oil Tanks (TK-04A and TK-04B), the Wastewater Tank (Tank 96), the Vacuum Unit drains, Diesel Desulfurization Unit, and the API Canals (an oil-water separator).  Under NSPS Subpart QQQ, an individual drain system consists of all process drains connected to the first common downstream junction box, including the drains and the common junction box together with their associated sewer lines and other junction boxes, down to the receiving oil-water separator.  40 C.F.R. § 60.691.  An oil-water separator is the wastewater treatment equipment used to separate oil from water.  *Id.*  It consists of a separation tank, which also includes the forebay and other separator basins, skimmers, weirs, grit chambers, and sludge hoppers.  *Id.*  Slop oil facilities, including tanks, are included in the definition of oil-water separator, along with storage vessels and auxiliary equipment located between individual drain systems and the oil-water separator.  *Id.*  An aggregate facility means an individual drain system together with ancillary downstream sewer lines and oil-water separators, down to and including the secondary oil-water separator.  As such, each of the individual drain systems and oil-water separators at the Kenai Refinery is an "affected facility" at a "stationary source" and at

a "petroleum refinery" within the meaning of 40 C.F.R. §§ 60.1, 60.2, 60.690-91, and subject to the requirements of NSPS Subpart QQQ, 40 C.F.R. § 60.690 *et seq.*

256.    At all relevant times herein, NSPS Subpart QQQ and the Kenai Refinery AOP permit have required Defendant Tesoro Alaska to construct and operate its wastewater system as a closed vent system with a control device complying with the requirements of 40 C.F.R. § 60.692–5.  40 C.F.R. § 60.693-1(a), (b); Kenai Refinery AOP Condition 42 and Condition 60 of its revised AOP issued in 2012.  Closed vent systems are subject to a no detectable VOC emissions performance standard, which is demonstrated by "an instrument reading of less than 500 ppm above background, as determined during the initial and semiannual inspections by the methods specified in [40 C.F.R.] § 60.696."  40 C.F.R. § 60.692-5(e)(1); Kenai Refinery AOP Condition 42.

257.    Defendant Tesoro Alaska operates, and at all relevant times has operated, its wastewater system at the Kenai refinery as a closed vent system using a carbon absorption system as a control device.

258.    At all times relevant herein, NSPS Subpart QQQ and the Kenai Refinery AOP have required Defendant Tesoro Alaska to install, calibrate, and operate a monitoring system on its wastewater system to detect VOC emissions.  40 C.F.R. § 60.695; Kenai Refinery AOP Condition 42.  Method 21 must be used to measure emissions concentrations for closed vent systems.  40 C.F.R. § 60.696(b).  Method 21 requires that the testing instrument be calibrated before each use – i.e., the gas span for the instrument must have zero air (less than 10 ppm of hydrocarbon in air) and a mixture of methane or n-hexane and air at a concentration of about, but less than, 10,000 ppm methane or n-hexane.  *Id.*  NSPS Subpart QQQ requires that emissions

monitoring records must be kept in accordance with 40 C.F.R. § 60.697(a), and retained for at least two years.  40 C.F.R. § 60.697(f)(3)(x)(B).

259.    On numerous occasions from April of 2008, through August 1, 2008, Defendant Tesoro Alaska used expired calibration gas for leak inspections on the wastewater system at both the Vacuum Unit and the Diesel Desulfurization Unit in violation of NSPS Subpart QQQ, 40 C.F.R. § 60.696, and the Kenai Refinery AOP Condition 42.

260.    In February of 2006, Defendant Tesoro Alaska failed to monitor a carbon absorption device (canister) on the wastewater system at the Vacuum Unit for one week in violation of NSPS Subpart QQQ, 40 C.F.R. § 60.696, and the Kenai Refinery AOP Condition 42.

261.    On numerous occasions from October of 2006, through June of 2010, Defendant Tesoro Alaska failed to maintain monitoring records, take instrument readings at the time of carbon change-out, conduct daily calibrations of the Method 21 instrument, and use a span gas concentration that was significantly less than 10,000 ppm methane or n-hexane for the wastewater system at the Vacuum Unit and Diesel Desulfurization Unit in violation of NSPS Subpart QQQ, 40 C.F.R. §§ 60.695-697, and the Kenai Refinery AOP Condition 42.

262.    On numerous occasions from April of 2006, through October of 2006, Defendant Tesoro Alaska failed to keep monitoring records for the Vacuum Unit wastewater systems and control device in violation of NSPS Subpart QQQ, 40 C.F.R. § 60.697(f)(3)(x)(B), and the Kenai Refinery AOP Condition 42.

263.    At all times relevant herein, NSPS Subpart QQQ and the Kenai Refinery AOP has required Defendant Tesoro Alaska to construct and operate a floating roof on an oil-water separator tank, slop oil tank, storage vessel, or other auxiliary equipment subject to the

requirements of NSPS Subpart QQQ.  40 C.F.R. § 60.693-2(a); Kenai Refinery AOP Condition

42.  To comply with NSPS Subpart QQQ, a floating roof must be equipped with a closure device

consisting of a primary and secondary seal between the wall of the separator and the roof edge.

40 C.F.R. § 60.693-2(a)(1).  The primary seal must be a liquid-mounted seal or a mechanical

shoe seal, and the secondary seal must be above the primary seal and cover the annular space

between the floating roof and the wall of the separator.  40 C.F.R. § 60.693-2(a)(1)(i), (ii); Kenai

Refinery AOP Condition 42.

264.    From April of 2002, through September of 2007, Defendant Tesoro Alaska

operated Wastewater Tank No. 96 without a secondary seal of the floating roof in violation of

NSPS Subpart QQQ, 40 C.F.R. § 60.693-2(a)(1), and the Kenai Refinery AOP Condition 42.

265.    At all times relevant herein, NSPS Subpart QQQ and the Kenai Refinery AOP,

have required that where a floating roof is installed, an initial visual inspection of all access

doors and other openings must be conducted to ensure that there is a tight fit around the edges of

the doors and openings to identify problems that could result in VOC emissions.  40 C.F.R.

§ 60.693-2(a)(1)(iv)(5)(i); Kenai Refinery AOP Condition 42.  After an initial visual inspection

of doors and other openings, the owner or operator must conduct semiannual visual inspections.

40 C.F.R. § 60.693-2(a)(1)(iv)(5)(i); Kenai Refinery AOP Condition 42.

266.    From July of 2003, through March of 2008, Defendant Tesoro Alaska failed to

conduct semiannual inspections of access doors and other openings on Wastewater Tank 96, and

Slop Oil Tanks 04A and 04B in violation of NSPS Subpart QQQ, 40 C.F.R. § 60.693-

2(a)(1)(iv)(5)(i), and the Kenai Refinery AOP Condition 42.

267.    At all times relevant herein, NSPS Subpart QQQ and the Kenai Refinery AOP have required that each oil-water separator tank, slop oil tank, storage vessel, or other auxiliary equipment equipped and operated with a fixed roof must adhere to certain specifications, including a requirement that if the roof has access doors or openings, such doors or openings shall be gasketed, latched, and kept closed at all times during operation of the separator system, except during inspection and maintenance.  40 C.F.R. § 60.693-2(a)(2); Kenai Refinery AOP Condition 42.

268.    In June and July of 2009, an access door was left in the open position on the closed drain system on the API Canal at the Kenai Refinery in violation of NSPS Subpart QQQ, 40 C.F.R. § 60.693-2(a)(2), and the Kenai Refinery AOP Condition 42.

269.    Beginning in 2005 and continuing to December of 2013, Defendant Tesoro Alaska failed to install latches and gaskets in 8 access hatches on the API Canal in violation of NSPS Subpart QQQ, 40 C.F.R. § 60.692-3(a)(3), and Kenai Refinery AOP Condition 42.

270.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

271.    Under Alaska Statute § 46.03.760, for the above-listed violations, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

## SEVENTEENTH CLAIM FOR RELIEF

### Claim by the United States and State of Alaska
### for Violations of NESHAP Subpart UUU and Kenai Refinery AOP
### Relating to SRU Process Vent Emissions at the Kenai Refinery

272.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

273.    The Kenai SRU is a Claus or other type of sulfur recovery plant at a petroleum refinery that is a major source of HAPs which contains, and at all relevant times herein has contained, a process vent or group of process vents that are associated with sulfur recovery within the meaning of 40 C.F.R. § 63.1562 (b).  As such, the Kenai Refinery SRU is an "affected source" and an "existing source" within the meaning of 40 C.F.R. §§ 63.2, 63.1562, and subject to the requirements of NESHAP Subpart UUU, 40 C.F.R. § 63.1560 *et seq.*

274.    At all times relevant herein, NESHAP Subpart UUU and the Kenai Refinery SOP have limited $SO_2$ emissions from the Kenai Refinery SRU to 250 ppmv (dry basis) at 0% excess air.  40 C.F.R. § 63.1568(a)(1) and Table 29; the Kenai Refinery AOP Condition 51.  This limit applies at all times except during periods of start-up, shut-down, or malfunction.  40 C.F.R. § 63.6(f).

275.    On multiple occasions from April 11, 2005 through November of 2010, the Kenai SRU exceeded the emission limit of 250 ppmv (dry basis) sulfur dioxides at 0% excess air in violation of NESHAP Subpart UUU, 40 C.F.R. §§ 63.1568(a)(1) and Table 29, and the Kenai Refinery AOP Condition 51.

276.    At all times relevant herein, NESHAP Subpart UUU and the Kenai Refinery AOP have required Defendant Tesoro Alaska to install, calibrate, operate, and maintain a CEMS on

the Kenai SRU as specified in 40 C.F.R. § 63.1572 and Table 31 of Subpart UUU.  40 C.F.R. § 63.1568(b)(1); the Kenai Refinery AOP Condition 51.  NESHAP Subpart UUU and the Kenai Refinery AOP require Defendant Tesoro Alaska to conduct a Relative Accuracy Test Audit (RATA) annually in accordance with Subpart UUU Table 40, which sets forth various specifications and test procedures for $SO_2$ and NOx CEMs.  40 C.F.R. § 63.1572, Table 40 and 40 C.F.R. Part 60 Performance Specification 2; the Kenai Refinery AOP Condition 51.

277.    On numerous occasions from April 11, 2005 to December of 2005, Defendant Tesoro Alaska failed to calibrate an oxygen monitor in accordance with the requirements set forth in Table 40 of Subpart UUU, in violation of NESHAP Subpart UUU, 40 C.F.R. § 63.1568(b)(1), and the Kenai Refinery AOP Condition 51.

278.    In June of 2007, Defendant Tesoro Alaska submitted an incomplete report for a RATA performed in May of 2007 in violation of NSPS Subpart UUU Table 40, 40 C.F.R. Part 60 Performance Specification Part 2 (Section 8.5), and the Kenai Refinery AOP Condition 51.

279.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

280.    Under Alaska Statute § 46.03.760, for the above-listed violations, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

## EIGHTEENTH CLAIM FOR RELIEF

### Claim by the United States and State of Alaska
### for Violation of LDAR Requirements at the Kenai Refinery

281.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

282.    The Kenai Refinery has, and at all relevant times herein has had, various "equipment" within "process units" that were constructed, reconstructed or modified after January 4, 1983, and on or before November 7, 2006, within the meaning of NSPS Subpart GGG, 40 C.F.R. §§ 60.590-591.  The equipment within process units are each "affected facilities" subject to the requirements of NSPS Subpart GGG, 40 C.F.R. § 60.590 *et seq.*

283.    The Kenai Refinery has, and all relevant times herein has had, various "petroleum refining process units" with "emission points" within the meaning of NESHAP Subpart CC, 40 C.F.R. § 63.641.  As such, the petroleum refining process units at the Kenai Refinery and their related emission points are "affected sources" within the meaning of NESHAP Subpart CC, 40 C.F.R. § 63.641, and are subject to the requirements of NESHAP Subpart CC, 40 C.F.R. § 63.640 *et seq.*

284.    At all times relevant herein, the Kenai Refinery AOP Conditions 40 and 50 has required that Defendant Tesoro Alaska comply with NSPS Subpart GGG and NESHAP Subpart CC.

285.    At all times relevant herein, both NSPS Subpart GGG and NESHAP Subpart CC have required Defendant Tesoro Alaska to comply with NSPS Subpart VV (40 C.F.R. § 60.480 et. seq.).  NSPS Subpart GGG, 40 C.F.R. § 60.592; NESHAP Subpart CC, 40 C.F.R. § 63.648.

286.    At all times relevant herein, NSPS Subpart VV has imposed the following

requirements with respect to pumps in light liquid service:

Each pump in light liquid service must be monitored monthly to detect VOC leaks using
one of the methods specified in 40 C.F.R. § 60.485(b).  40 C.F.R. § 60.482-2(a)(1).

Each affected pump in light liquid service must also be visually inspected on a weekly
basis for indications of liquids dripping from the pump seal, except as provided in
40 C.F.R § 60.482–1(f).  40 C.F.R. § 60.482-2(a)(2).

Where visual inspections reveal indications of a pump seal leaking liquids, the owner or
operator must monitor the pump, or designate a leak and initiate repairs.  40 C.F.R.
§ 60.482-2(b)(2).

If a repair is required, it must be completed "as soon as practicable, but not later than
15 calendar days after it is detected, except as provided in [40 C.F.R.] § 60.482-9," which
sets out standards an operator must meet to delay equipment repair after a leak detection.
40 C.F.R. § 60.482-2(c)(1).  A first repair attempt must be made no later than five
calendar days after each leak is detected; first repair attempts include, but are not limited
to, the tightening of packing gland nuts and ensuring that the seal flush is operating at
design pressure and temperature.  *Id.*

A repair is defined to consist of a two-step process: (1) the leak must be repaired
(eliminated); and (2) the equipment must be re-inspected/certified (monitored) to verify
that emissions are below the applicable leak definition.  40 C.F.R. § 60.481.

In testing for leaks, the testing instrument shall be calibrated before each use – *i.e.*, the
gas span for the instrument must have zero air (less than 10 ppm of hydrocarbon in air)
and a mixture of methane or n-hexane and air at a concentration of about, but less than,
10,000 parts per million (ppm) methane or n-hexane.  40 C.F.R. § 60.485(b).

287.    From July of 2003, through April of 2010, Defendant Tesoro Alaska violated the

NSPS Subpart VV requirements listed in the preceding paragraph with respect to multiple pumps

in light liquid service at several process units and petroleum refining process units at the Kenai

Refinery including the Reformer Unit, LPG Unit, PRIP Unit, Tank Farm, Vacuum Unit,

Hydrocracker Unit and Crude Unit.  These violations constitute violations of NSPS Subpart

GGG and NESHAP Subpart CC, which require compliance with NSPS Subpart VV, 40 C.F.R.

§§ 60.592, 63.648, and the Kenai Refinery AOP Conditions 40 and 50.

288.    At all times relevant herein, NSPS Subpart VV has imposed the following

requirements regarding caps on open-ended valves or lines:

> Each open-ended valve or line must be equipped with a cap, blind flange, plug, or second valve.  40 C.F.R. § 60.482-6(a)(1).

> The cap, blind flange, plug, or second valve must seal the open end of the valve or line at all times, except during operations requiring process fluid flow through the open-ended valve or line.  40 C.F.R. § 60.482-6(a)(2).

> Each open-ended valve or line equipped with a second valve must be operated such that the valve on the process fluid end is closed before the second valve is closed.  40 C.F.R. § 60.482-6(b).

289.    From January of 2006, through March of 2008, Defendant Tesoro Alaska violated

the NSPS Subpart VV requirements listed in the preceding paragraph with respect to numerous

caps on open ended valves or lines at several process units and petroleum refining process units

at the Kenai Refinery including the Hydrocracker, PRIP Unit, DIB Unit, and Vacuum Unit,

Tanks 10, 12, 40, 41, 45, 60, 61, 62, 63, 64, 65, and 66, Crude Unit, Reformer, LPG Unit, and

Hydrogen Unit.  These violations constitute violations of NSPS Subpart GGG and NESHAP

Subpart CC, which require compliance with NSPS Subpart VV, 40 C.F.R. §§ 60.592, 648, and

the Kenai Refinery AOP Conditions 40 and 50.

290.    At all times relevant herein, NSPS Subpart VV has imposed the following

requirements with respect to valves in gas, vapor, or light liquid service:

> Any valves in gas or vapor service, or any valves in light liquid service, that have not had a positive leak detection for two successive months, may be subjected to curtail monitoring: *i.e.*, valves without leak detections can be subject to quarterly monitoring, starting on the first month of every quarter (beginning with the next quarter), until a leak is detected in a valve.  40 C.F.R. § 60.482-7(c)(1)(i).

If a leak is detected, that valve shall be monitored monthly until a leak is not detected for two successive months.  40 C.F.R. § 60.482-7(c)(2).

When a leak is detected, it shall be repaired as soon as practicable, but no later than 15 calendar days after the leak is detected, unless a delay in repair is justified under 40 C.F.R. § 60.482-9.  40 C.F.R. § 60.482-7(d)(1).  When a repair is required, a first attempt must be made no later than five calendar days after each leak is detected. 40 C.F.R. § 60.482-7(d)(2).  "Repair" is defined as a two-step process:  (a) the leak must be repaired (eliminated); and (b) the equipment must be re-inspected/certified (monitored) to verify that emissions are below the applicable leak definition.  40 C.F.R. § 60.481.

Any valves in gas or vapor service, or any valves in light liquid service, that are difficult to monitor (DTM) are exempt but not more than 3.0 percent of the total number of valves can be designated as DTM.  40 C.F.R. § 60.482-7(h).

291.    From July of 2003, through April of 2010, Defendant Tesoro Alaska violated the

NSPS Subpart VV requirements listed in the preceding paragraph with respect to numerous

valves in gas, vapor, or light liquid service in several process units and petroleum refining

process units at the Kenai Refinery including the Crude Unit, Reformer Unit, PRIP Unit,

Hydrocracker Unit, and Tank Farm.  These violations constitute violations of NSPS Subpart

GGG and NESHAP Subpart CC, which require compliance with NSPS Subpart VV, 40 C.F.R.

§§ 60.592, 63.648, and the Kenai Refinery AOP Conditions 40 and 50.

292.    At all times relevant herein, Subpart VV has imposed the following requirements

with respect to pumps and valves in heavy liquid service, pressure relief devices in light liquid or

heavy liquid service, and connectors:

If evidence of a potential leak is found by visual, audible, olfactory, or any other detection method at pumps and valves in heavy liquid service, pressure relief devices in light liquid or heavy liquid service, and connectors the facility must either:  (a) monitor the equipment within five days using the method specified in § 60.485(b) and comply with the additional requirements of 40 C.F.R. § 60.482-8(b) through (d); or (b) eliminate the visual, audible, olfactory, or other indication of a potential leak within five calendar days of detection.  40 C.F.R. §§ 60.482-8(a)(1), (2).

When a leak is detected, it must be repaired as soon as practicable, but no later than 15 calendar days after it is detected, except as provided in 40 C.F.R. § 60.482-9. 40 C.F.R. § 60.482-8(c)(1).

The first attempt at repair shall be made no later than five calendar days after each leak is detected.  40 C.F.R. § 60.482-8(c)(2).

293.    In 2007 and 2008, Defendant Tesoro Alaska violated numerous of the NSPS Subpart VV requirements listed in the preceding paragraph with respect to pumps and valves in heavy liquid service, pressure relief devices in light liquid or heavy liquid service, and connectors at various process units and petroleum refining process units at the Kenai Refinery including the Crude Unit, Reformer, Hydrocracker, the PRIP Unit, the DIB Unit, and Vacuum Units, and Tank Farm.  These violations constitute violations of NSPS Subpart GGG and NESHAP Subpart CC, which require compliance with NSPS Subpart VV, 40 C.F.R. §§ 60.592, 63.648, and the Kenai Refinery AOP Conditions 40 and 50.

294.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

295.    Under Alaska Statute § 46.03.760, for the above-listed violations, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

## NINETEENTH CLAIM FOR RELIEF

**Claim by the United States and State of Alaska
for Violations of the Alaska SIP and Kenai Refinery AOP
Relating to Excess SO$_2$ Emissions
from Various Sources at the Kenai Refinery**

296.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

297.    At all times relevant herein, the Alaska SIP and Kenai Refinery AOP have provided that Defendant Tesoro Alaska "shall not cause or allow sulfur compound emissions, expressed as SO$_2$ averaged over three hours, to exceed, for Source ID(s) 2, 8–11, 13, 14, 17, 20-31, and 43–46 (various heaters, reheaters, reboilers, furnaces, the Kenai SRU incinerator stack and the SCOT Tail gas burner pilot) burning only gas, the concentration of uncontrolled emissions that would result from burning gas containing 230 mg/dscm H$_2$S.  18 AAC § 50.055(d)(3)(A)-(C); Kenai Refinery AOP Condition 5.

298.    From June of 2005, through May of 2009, Defendant Tesoro Alaska burned gas which had a H$_2$S concentration in excess of 230 mg/dscm (162 ppm) at the SRU Flare, the Kenai SRU Incinerator Stack, and a number of process heaters in violation of the Alaska SIP, 18 AAC § 50.055(d)(3)(A), and Kenai Refinery AOP Condition 5.

299.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

300.     Under Alaska Statute § 46.03.760, for the above-listed violations, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues

## TWENTIETH CLAIM FOR RELIEF

### Claim by the United States and State of Alaska for Violations of Kenai Refinery AOP Relating to Reporting Sulfur Dioxide Emission Rate from the Kenai Refinery

301.     Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

302.     At all times relevant herein, the Kenai Refinery AOP Condition 8.4(c) has required that Defendant Tesoro Alaska include in its semiannual Facility Operating Report a weekly "mean [sulfur dioxide] concentration to nearest 5 ppm and the mean mass emission rate in lb/hr, and the semiannual standard deviation of the concentration."

303.     From August of 2005, through June of 2006, Defendant Tesoro Alaska failed to include with its Facility Operating Reports a weekly sulfur dioxide mean mass emission rate in lb/hr in violation of the Kenai Refinery AOP Condition 8.4(c).

304.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

305.     Under Alaska Statue § 46.03.760, for the above-listed violations, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for

the initial violation, not more than $5,000 for each day after that on which the violation
continues.

## TWENTY-FIRST CLAIM FOR RELIEF

### Claim by the United States and State of Alaska
### for Violations of the Kenai Refinery AOP Relating to
### Excess Oxygen in Exhaust Gas from Heaters and Boilers at the Kenai Refinery

306.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully
set forth herein.

307.    At all times relevant herein, the Kenai Refinery AOP Condition 10.1 has
prohibited Defendant Tesoro Alaska from causing or allowing the percentage of oxygen content
in the exhaust gas from various heaters and boilers (identified as Source IDs 6-11) to exceed the
limits set in Permit Condition 9, Table 2.  Permit Condition 9, Table 2, states that two of the
heaters and boilers (Source IDs 6 & 7) shall not exceed seven-percent oxygen, and that the other
heaters and boilers (Source IDs 8-11) shall not exceed six-percent oxygen.

308.    On numerous occasions from April of 2006, through April of 2010, the percent
oxygen in the exhaust gas in multiple heaters and boilers exceeded the allowed limit set forth in
Table 2 of Condition 9 in violation of the Kenai Refinery AOP Conditions 9 and 10.1.

309.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA,
42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment
of civil penalties of not more than $32,500 per violation per day for each violation that occurred
after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day
for each violation that occurred after January 12, 2009.

310.     Under Alaska Statue § 46.03.760, for the above-listed violations, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

## TWENTY-SECOND CLAIM FOR RELIEF

### Claim by the United States and State of Alaska
### for Violation of the Kenai Refinery AOP Condition 11
### Relating to BTX emissions from Air Strippers at the Kenai Refinery

311.     Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

312.     At all times relevant herein, the Kenai Refinery AOP Condition 11 has contained several requirements related to benzene, toluene, and xylene (BTX) emissions concentrations, monitoring, and reporting for the Surface Impoundment Air Stripper (AS-1310) and Phillips/Marathon Air Stripper (AS-1320) located at the Kenai Refinery.

313.     At all times relevant herein, the Kenai Refinery AOP Condition 11 has limited BTX emissions from the Surface Impoundment Air Stripper (AS-1310) and Phillips/Marathon Air Stripper (AS-1320) to no more than 0.24 mg/sec and 0.94 mg/sec, respectively.

314.     On numerous occasions from July of 2005, through March of 2007, Defendant Tesoro Alaska allowed BTX BACT emissions from the Phillips/Marathon Air Stripper to exceed the permit limit of .94 mg/sec. in violation of the Kenai Refinery AOP Conditions 9 and 10.1.

315.     At all times relevant herein, the Kenai Refinery AOP Condition 11.2.a. has required Defendant Tesoro Alaska to maintain a minimum temperature of 1500 ºF in the combustion chamber of the thermal oxidation unit.  When the temperature is less than 1500 ºF,

the facility must either shut down the Phillips/Marathon Air Stripper or route exhaust gas to the Granular Activated Carbon Unit.

316.    On numerous occasions from August of 2006, through March of 2007, Defendant Tesoro Alaska failed to maintain a minimum temperature of 1500 ºF in the combustion chamber of the thermal oxidation unit and failed to either shut down the Phillips/Marathon Air Stripper or route exhaust gas to the Granular Activated Carbon Unit when the minimum temperature in the combustion chamber dropped below 1500 ºF in violation of the Kenai AOP Condition 11.2a.

317.    At all times relevant herein, the Kenai Refinery AOP Condition 11.3 has required Defendant Tesoro Alaska to continuously monitor temperature in the combustion chamber of the thermal oxidizer on the Phillips/Marathon Air Stripper.

318.    On numerous occasions from August of 2006, through March of 2007, Defendant Tesoro Alaska failed to continuously monitor the temperature in the combustion chamber of the thermal oxidizer of the Phillips/Marathon Air Stripper in violation of the Kenai Refinery AOP Condition 11.3.

319.    At all times relevant herein, the Kenai Refinery AOP Condition 11.4 has required Defendant Tesoro Alaska to conduct monthly monitoring of BTX concentrations at the inlet for the thermal oxidation unit on the Phillips/Marathon Air Stripper.

320.    In May of 2009, Defendant Tesoro Alaska failed to monitor the inlet BTX concentration of the thermal oxidation unit on the Phillips/Marathon Air Stripper in violation of the Kenai Refinery AOP Condition 11.4

321.    At all times relevant herein, the Kenai Refinery AOP Condition 11.7 has required Defendant Tesoro Alaska to report compliance with Conditions 11.3-11.6.

322.     In August of 2006, Defendant Tesoro Alaska failed to report in the Facility Operating Report that the daily average temperature in the combustion chamber had dropped below the minimum temperature of 1500 degrees F required by the Kenai Refinery AOP Condition 11.2.  This failure to report is a violation of the Kenai Refinery AOP Condition 11.7.

323.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

324.     Under Alaska Statue § 46.03.760, for the above-listed violations, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

### TWENTY-THIRD CLAIM FOR RELIEF

**Claim by the United States and State of Alaska
for Violations of the Kenai Refinery AOP Relating to Compliance
with the Approved Quality Assurance Plan for Process Monitoring
Requirements at the Kenai Refinery**

325.     Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

326.     At all times relevant herein, the Kenai Refinery AOP Condition 12 has required Defendant Tesoro Alaska to maintain and comply with the approved Quality Assurance Plan

(QAP) developed for the process monitoring requirements described in Conditions 7.2, 8, 10, 11, 34.2 and 36.

327.    In January and February of 2007, Defendant Tesoro Alaska failed to comply with the provisions in the approved QAP related to the control of benzene, toluene, and xylene emissions from contaminated groundwater cleanup operations and failed to maintain calibration reports in violation of the Kenai Refinery AOP Condition 12.

328.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

329.    Under Alaska Statue § 46.03.760, for the above-listed violations, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

## TWENTY-FOURTH CLAIM FOR RELIEF

### Claim by the United States and State of Alaska
### for Violations of the Kenai Refinery Relating to Recording
### Start and Stop Data for Engines at the Kenai Refinery

330.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

331.    At all times relevant herein, the Kenai Refinery AOP Condition 15.1 has required Defendant Tesoro Alaska to record the time and date that North Cummins NHS6-1F (P-708A)

and South Cummins NHS6-1F (P-708B) engines located at the Kenai Refinery start and stop operations.

332.    On numerous occasions from July of 2006, through January of 2008, Defendant Tesoro Alaska failed to record engine start and stop times for the North Cummins NHS6-1F and South Cummins NHS6-1F engines in violation of the Kenai Refinery AOP Condition 15.1.

333.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

334.    Under Alaska Statue § 46.03.760, for the above-listed violations, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

## TWENTY-FIFTH CLAIM FOR RELIEF

### Claim by the United States and State of Alaska
### for Violations of the Kenai Refinery AOP Relating to Control of NOx emissions
### from Stationary Gas Turbines at the Kenai Refinery

335.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

336.    At all times relevant herein, the Kenai Refinery AOP Condition 34.2 has required Defendant Tesoro Alaska to control NOx emissions by operating its GT-1400 and GT-1410 stationary gas turbines with a water injection rate of not less than 0.8 pounds of water per pound

of fuel (whether natural gas, LPG or diesel) when the sources operate at loads greater than

2.5 megawatts.

337.    On numerous occasions from July of 2005, through December of 2006, Defendant

Tesoro Alaska operated the GT-1400 and GT-1410 turbines with a water injection rate of less

than 0.8 pounds of water per pound of fuel, while operating at a load greater than 2.5 MW in

violation of the Kenai Refinery AOP Condition 34.2.

338.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA,

42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment

of civil penalties of not more than $32,500 per violation per day for each violation that occurred

after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day

for each violation that occurred after January 12, 2009.

339.    Under Alaska Statue § 46.03.760, for the above-listed violations, Defendant

Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for

the initial violation, not more than $5,000 for each day after that on which the violation

continues.

### TWENTY-SIXTH CLAIM FOR RELIEF

**Claim by the United States and State of Alaska
for Violations of the Alaska SIP and Kenai Refinery AOP
Relating to Certification of Reports for the Kenai Refinery**

340.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully

set forth herein.

341.    At all times relevant herein, the Alaska SIP and Kenai Refinery AOP have

required Defendant Tesoro Alaska to certify all reports, compliance certifications, or other

documents submitted to ADEC.  18 AAC § 50.205; Kenai Refinery AOP Condition 78.  The

certification must be signed by an official responsible for compliance with the Kenai Refinery

AOP, and must include the following language: "Based on information and belief formed after

reasonable inquiry, I certify that the statements and information in and attached to this document

are true, accurate, and complete."  Excess emission reports must be certified either upon

submittal or with an operating report required for the same reporting period.  All other reports

and other documents must be certified upon submittal.  When certifying a compliance

certification, the official's signature must be notarized.  18 AAC § 50.205; Kenai Refinery AOP

Condition 78.

342.    From January of 2006, through March of 2009, Defendant Tesoro Alaska failed

to certify multiple reports in violation of the Alaska SIP, 18 AAC § 50.205, and the Kenai

Refinery AOP Condition 78.

343.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA,

42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment

of civil penalties of not more than $32,500 per violation per day for each violation that occurred

after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day

for each violation that occurred after January 12, 2009.

344.    Under Alaska Statue § 46.03.760, for the above-listed violations, Defendant

Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for

the initial violation, not more than $5,000 for each day after that on which the violation

continues.

## TWENTY-SEVENTH CLAIM FOR RELIEF

### Claim by the United States and State of Alaska
### for Violations of the Alaska SIP and Kenai Refinery AOP Relating
### to Reporting Certain Emission Events at the Kenai Refinery

345.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

346.    At all times relevant herein, the Alaska SIP and Kenai Refinery AOP have required that, as soon as possible after the event commenced or is discovered, Defendant Tesoro Alaska must report to ADEC:  (a) emissions that present a potential threat to human health or safety; and (b) excess emissions that Defendant Tesoro Alaska believes to be unavoidable. 18 AAC § 50.240(c); Kenai Refinery Condition 82.1.  Under Condition 82.1(b), within two working days after the event commenced or was discovered, Defendant Tesoro Alaska must report an unavoidable emergency, malfunction, or non-routine repair that causes emissions in excess of a technology-based emission standard.  Under Condition 82.1(c), Defendant Tesoro Alaska must report all other excess emissions and permit deviations within 30 days of the end of the month in which the emissions or deviation occurs, except as provided in conditions 82.1c(ii) and 82.1c(iii).  18 AAC § 50.240(c).

347.    On numerous occasions from 2005 through 2010, Defendant Tesoro Alaska failed to report all excess emissions and permit deviations within the required deadlines in violation of the Alaska SIP, 18 AAC § 50.240(c), and the Kenai Refinery AOP Condition 82.1.

348.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro Alaska is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred

after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

349.    Under Alaska Statue § 46.03.760, for the above-listed violations, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

<u>**TWENTY-EIGHTH CLAIM FOR RELIEF**</u>

**Claim by the United States
for PSD Violations Related to Emissions of $H_2S$ Associated with
Construction of a Delayed Coker at the Martinez Refinery**

350.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

351.    In about 2006, Defendant Tesoro R&M commenced construction of the Martinez Delayed Coker to replace the pre-existing fluid coker.  The construction of the Martinez Delayed Coker included the addition of new equipment, as well as the reuse of some pre-existing equipment from the replaced fluid coker.  In about 2008, Defendant Tesoro R&M began operating the Martinez Delayed Coker.

352.    The construction of the Martinez Delayed Coker was a physical and operational change to the Martinez Refinery constituting a "major modification" as that term is defined in 40 C.F.R. § 52.21(b)(2) for $H_2S$ because:  (a) it constitutes a "modification" within the meaning of Section 169(2)(C) of the CAA, 42 U.S.C. § 7479(2)(C) (incorporating the definition of that term from 42 U.S.C. § 7411(a)(4)); (b) it resulted in a "significant emissions increase" of $H_2S$, within the meaning of 40 C.F.R. § 52.21(b)(40); and (c) it resulted in a significant "net emissions

increase" of $H_2S$, within the meaning of 40 C.F.R. § 52.21(b)(3) (where, in both cases, 40 C.F.R. § 52.21(b)(23) defines "significant" as a rate of emissions that would equal or exceed 10 TPY of $H_2S$).

353.     Because the construction of the Martinez Delayed Coker was a "major modification" that resulted in a "significant emissions increase" and a significant "net emissions increase" of $H_2S$, the PSD Program and Regulations required and continue to require that Defendant Tesoro R&M:  (a) undergo a BACT review for $H_2S$ emissions from the Martinez Delayed Coker; (b) obtain appropriate permits to construct and operate the Martinez Delayed Coker; (c) demonstrate that the emissions increases from the construction of the Delayed Coker would not cause or contribute to violations of air quality standards; (d) provide for review and public comment on the air quality impacts of construction/operation of the Martinez Delayed Coker; and (e) comply with BACT emission limits on $H_2S$ from the Martinez Delayed Coker. 42 U.S.C. § 7475(a); 40 C.F.R. § 52.21.

354.     Defendant Tesoro R&M constructed and has subsequently operated the Martinez Delayed Coker without satisfying the requirements listed in (a) through (e) of the foregoing paragraph in violation of the PSD Program and Regulations and AIP (including Section 165(a) of the CAA, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21).

355.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

### TWENTY-NINTH CLAIM FOR RELIEF

**Claim by the United States
for NNSR Violations Related to POC Emissions Associated with
Construction of the Delayed Coker at the Martinez Refinery**

356.     Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

357.     In about 2006, Defendant Tesoro R&M commenced construction of the Martinez Delayed Coker to replace the pre-existing fluid coker.  The construction of the Martinez Delayed Coker included the addition of new equipment, as well as the reuse of some pre-existing equipment from the replaced fluid coker.  In about 2008, Tesoro R&M began operating the Martinez Delayed Coker.

358.     The Martinez Refinery is located in an area designated as Non-Attainment for ozone.  The Martinez Delayed Coker emits POCs, which are compounds that are precursors to ozone.

359.     In accordance with Section 173 of the CAA, 42 U.S.C. § 7503, and the NNSR Program and Regulations, on January 26, 1999, EPA approved portions of BAAQMD Rule 2-2, which was incorporated into the California SIP.  64 Fed. Reg. 3,850 (Jan 26, 1999); 40 C.F.R. § 52.220(c)(199)(i)(A)(8)).  BAAQMD Rule 2-2 provides for the review of new and modified sources and provides mechanisms, including the use of lowest achievable emissions rate under Section 171(3) of the CAA, 42 U.S.C. § 7501(3), which is commonly referred to as "California BACT", by which authorities to construct such sources may be granted.  BAAQMD Rule 2-2-101.  A "source" under BAAQMD Rule 2-2 is any article, machine, equipment, operation,

contrivance, or related groupings of such that may produce or emit air pollutants.  BAAQMD Rule 2-2-234.

360.     Among other things, BAAQMD Rule 2-2 requires an applicant for an authority to construct or a permit to operate to apply California BACT to any new or modified source that results in an emission from a new source or an increase in emissions from a modified source of POCs in excess of 10 pounds per highest day or a cumulative increase since April 5, 1991, for a modified source of 10 pounds per highest day.  BAAQMD Rule 2-2-301.  A "new source" under BAAQMD Rule 2-2 includes, among other things, any replacement of a source occurring after March 7, 1979.  BAAQMD Rule 2-2-225.4.  A "modified source or facility" under BAAQMD Rule 2-2 includes, among other things, any existing source or facility that will undergo a physical change, change in the method of operation of, or addition to an existing facility which results or may result in either an increase of the permitted emission level of a source, or of any air pollutant subject to BAAQMD's control.  BAAQMD Rule 2-2-223.

361.     The Martinez Delayed Coker constitutes multiple "sources," as that term is defined in BAAQMD Rule 2-2 at 2-2-234.  The addition of the Martinez Delayed Coker included:  (a) the construction and replacement of sources at the Martinez Refinery that constituted "new sources," as that term is defined in BAAQMD Rule 2-2 at 2-2-225, that resulted in emissions of POCs in excess of 10 pounds per highest day; and (b) physical and operational changes to the Martinez Refinery that constituted "modified sources," as that term is defined in BAAQMD Rule 2-2 at 2-2-223, that resulted in cumulative increases in emissions of POCs since April 5, 1991, of 10 pounds per highest day.

362.    Because the construction of the Martinez Delayed Coker resulted in emissions of POCs in excess of 10 pounds per highest day and cumulative increases in emissions of POCs since April 5, 1991, of 10 pounds per highest day, BAAQMD Rule 2-2 required and continues to require that Defendant Tesoro R&M comply with California BACT emissions limits on POCs from the Martinez Delayed Coker.  BAAQMD Rule 2-2-301.

363.    Defendant Tesoro R&M commenced construction of and has subsequently operated the Martinez Delayed Coker without satisfying the requirements listed in the foregoing paragraph in violation of BAAQMD Rule 2-2.

364.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

## THIRTIETH CLAIM FOR RELIEF

**Claim by the United States
for Violations of Federal Title V Requirements with Respect to
the Construction of the Martinez Delayed Coker at the Martinez Refinery**

365.    Paragraphs 1 through 132, 351 through 353, and 357 through 362 are re-alleged and incorporated by reference as if fully set forth herein.

366.    As set forth in Paragraphs 351-353, and 357-362 above, Defendant Tesoro R&M constructed the Martinez Delayed Coker in 2006, which triggered requirements, *inter alia*, to obtain PSD and NNSR Program permits requiring compliance with BACT emission limits on

$H_2S$ and California BACT emission limits on POCs from the Martinez Delayed Coker, and to operate the Martinez Delayed Coker in compliance with such emission limits.

367.    At all relevant times herein, the federal Title V Program and Regulations have required Defendant Tesoro R&M to submit a Title V permit application with respect to the construction of the Delayed Coker containing:  (a) information sufficient to determine all applicable air pollution control requirements (including any requirement to meet the applicable control technology requirements under the PSD Program and Regulations and NNSR Program and Regulations); (b) information that may be necessary to determine the applicability of other applicable requirements of the CAA; (c) a compliance plan for all applicable requirements for which the source is not in compliance; and (d) a certification of compliance with all applicable requirements by a responsible official.  42 U.S.C. § 7661b(b)-(c); 40 C.F.R. § 70.5.

368.    At all times relevant herein, the federal Title V Program and Regulations have required that any permit applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information. 40 C.F.R. § 70.5(b).

369.    With respect to the construction of the Martinez Delayed Coker, Defendant Tesoro R&M failed to submit complete and timely applications for Title V permits, or submit supplementary facts or corrected information for previously submitted Title V permit applications that satisfied the requirements set forth in (a) through (d) of Paragraph 367 above in violation of the federal Title V Program and Regulations (including 40 C.F.R. § 70.5(b)).

370.    At all times relevant herein, the federal Title V Program and Regulations have provided that no source may operate except in compliance with a Title V permit.  42 U.S.C. § 7661a(a); 40 C.F.R. §§ 70.1(b), 70.7(b).

371.    Since about 2008, Defendant Tesoro R&M operated and continues to operate the Martinez Delayed Coker without having a valid Title V permit requiring compliance with: (a) BACT emission limits on H2S and California BACT emission limits on POCs from the Martinez Delayed Coker; or (b) a compliance plan for coming into compliance with such emission limits in violation of the federal Title V Program and Regulations (including Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and 40 C.F.R. §§ 70.1(b) and 70.7(b)).

372.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

## THIRTY-FIRST CLAIM FOR RELIEF

### Claim by the United States for PSD Violations
### Related to Emissions of SO$_2$ Associated with
### Major Modifications to the Martinez SAP at the Martinez Refinery

373.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

374.    Since about 1994, the Martinez SAP has undergone multiple physical and operational changes (collectively referred to herein as the "Martinez SAP Projects").

375.    The physical and operational changes undertaken as part of the Martinez SAP Projects constituted one or more "major modifications" as that term is defined in 40 C.F.R. § 52.21(b)(2) because:  (a) they are "modification(s)" within the meaning of Section 169(2)(C) of the CAA, 42 U.S.C. § 7479(2)(C) (incorporating the definition of that term from 42 U.S.C. § 7411(a)(4)); (b) they resulted in a "significant emissions increase" of $SO_2$ within the meaning of 40 C.F.R. § 52.21(b)(40); and (c) they resulted in a significant "net emissions increase" of $SO_2$ within the meaning of 40 C.F.R. §52.21(b)(3) (where, in both cases, 40 C.F.R. § 52.21(b)(23) defines "significant" as a rate of emissions that would equal or exceed 40 TPY of $SO_2$).

376.    Because the Martinez SAP Projects constitute one or more "major modifications" for $SO_2$, the PSD Program and Regulations required and continue to require that the owner/operator:  (a) undergo a BACT review for $SO_2$ emissions from the Martinez SAP; (b) obtain appropriate permits to construct and operate the Martinez SAP; (c) demonstrate that the emissions increases from the Martinez SAP Projects would not cause or contribute to violations of air quality standards; (d) provide for review and public comment on the air quality impacts of the Martinez SAP Projects; and (e) comply with BACT emission limits on $SO_2$ from the Martinez SAP.  42 U.S.C. § 7475(a); 40 C.F.R. § 52.21.

377.    Defendant Tesoro R&M commenced one or more of the Martinez SAP Projects and, since 2002, has subsequently operated the modified Martinez SAP without satisfying the requirements set forth in (a) through (e) of the foregoing Paragraph in violation of the PSD Program and Regulations and AIP (including Section 165 of the CAA, 42 U.S.C. 7475, and 40 C.F.R. § 52.21).

378.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

## THIRTY-SECOND CLAIM FOR RELIEF

**Claim by the United States
for Violations of Federal Title V Requirements with Respect to
the SAP Modifications at the Martinez Refinery**

379.     Paragraphs 1 through 132 and 374 through 376 are re-alleged and incorporated by reference as if fully set forth herein.

380.     As set forth in Paragraphs 374-376 above, Defendant Tesoro R&M undertook one or more Martinez SAP Projects which, as "major modifications," triggered requirements, *inter alia*, to obtain PSD Program permits requiring compliance with BACT emission limits on $SO_2$ from the Martinez SAP, and to operate the Martinez SAP in compliance with these limits.

381.     At all times relevant herein, the federal Title V Program and Regulations have required and continue to require that Defendant Tesoro R&M submit a Title V permit application with respect to the Martinez SAP Projects containing:  (a) information sufficient to determine all applicable air pollution control requirements (including any requirement to meet the applicable control technology requirements under the PSD Program and Regulations); (b) information that may be necessary to determine the applicability of other applicable requirements of the CAA; (c) a compliance plan for all applicable requirements for which the Martinez SAP is not in

compliance; and (d) a certification of compliance with all applicable requirements by a responsible official.  42 U.S.C. § 7661b(b)-(c); 40 C.F.R. § 70.5.

382.    At all times relevant herein, the federal Title V Program and Regulations have required that any permit applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information. 40 C.F.R. § 70.5(b).

383.    With respect to the Martinez SAP Projects, Defendant Tesoro R&M failed to submit complete and timely applications for Title V permits, or submit supplementary facts or corrected information for previously submitted Title V permit applications that satisfied the requirements set forth in (a) through (d) of Paragraph 381 above in violation of the federal Title V Program and Regulations (including 40 C.F.R. § 70.5(b)).

384.    At all times relevant herein, the federal Title V Program and Regulations have provided that no source may operate except in compliance with a Title V permit.  42 U.S.C. § 7661a(a); 40 C.F.R. §§ 70.1(b), 70.7(b).

385.    Since about 2002, Defendant Tesoro R&M has operated and continues to operate the Martinez SAP without having a valid Title V operating permit requiring compliance with: (a) BACT emission limits on $SO_2$ from the Martinez SAP; or (b) a compliance plan for coming into compliance with such BACT emission limits in violation of the federal Title V Program and Regulations (including Section 502(a) of the CAA, 42 U.S.C. 7661a(a), and 40 C.F.R. §§ 70.1(b), 70.7(b)).

386.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

## THIRTY-THIRD CLAIM FOR RELIEF

**Claim by the United States
for Violations of NSPS Subpart A for Failing to Submit Excess Emissions Reports
for the Martinez SAP at the Martinez Refinery**

387.    Paragraphs 1 through 132 and 374 through 376 are re-alleged and incorporated by reference as if fully set forth herein.

388.    The Martinez SAP is a "sulfuric acid production unit" within the meaning of NSPS Subpart H, 40 C.F.R. § 60.81(a), which was constructed, reconstructed, or modified after August 17, 1971, within the meaning of 40 C.F.R. §§ 60.2 and 60.80(b).  As such, the Martinez SAP is an "affected facility" at a "stationary source" within the meaning of 40 C.F.R. §§ 60.1, 60.2, 60.80(a), and subject to requirements detailed in NSPS Subparts A and H, 40 C.F.R. §§ 60.1 *et seq.* and 60.80 *et seq.*

389.    At all times relevant herein, NSPS Subpart A has required Defendant Tesoro R&M to submit an excess emissions and monitoring systems performance report or a summary report form to EPA semiannually with specified information.  40 C.F.R. § 60.7(c).

390.    Since about February of 2006, Defendant Tesoro R&M failed to submit semiannual excess emissions reports for the Martinez SAP in violation of NSPS Subpart A, 40 C.F.R. § 60.7(c).

391.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

**THIRTY-FOURTH CLAIM FOR RELIEF**

**Claim by the United States
for Violations of the Federal Title V Requirements by Failing to
Include Requirement to Submit Excess Emissions Reports for the Martinez SAP
in the Martinez Refinery Title V Permit Application**

392.    Paragraphs 1 through 132 and 374 through 376 are re-alleged and incorporated by reference as if fully set forth herein.

393.    The Martinez SAP is a "sulfuric acid production unit" within the meaning of NSPS Subpart H, 40 C.F.R. § 60.81(a), that was constructed, reconstructed, or modified after August 17, 1971, within the meaning of 40 C.F.R. §§ 60.2 and 60.80(b).  As such, the Martinez SAP is an "affected facility" "at a stationary source" within the meaning of 40 C.F.R. §§ 60.1, 60.2, 60.80(a), and subject to requirements detailed in NSPS Subparts A and H, 40 C.F.R. §§ 60.1 *et seq.* and 60.80 *et seq.*

394.    At all times relevant herein, NSPS Subpart A has required Defendant Tesoro R&M to submit an excess emissions and monitoring systems performance report or a summary report form to EPA semiannually with specified information.  40 C.F.R. § 60.7(c).

395.    At all times relevant herein, the federal Title V Program and Regulations required that the application for a Title V permit shall include citations and descriptions of all applicable requirements and that any permit applicant who fails to submit any relevant facts or who has

submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.  40 C.F.R. §§ 70.5(b), 70.5(c)(4)(i).

396.     Defendant Tesoro R&M failed to supplement and correct previously submitted Title V permit applications to include citations and descriptions of all applicable requirements, including the requirement under NSPS Subpart A to submit periodic excess emissions reports for the Martinez SAP in violation of the federal Title V Program and Regulations (including 40 C.F.R. § 70.5).

397.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

## THIRTY-FIFTH CLAIM FOR RELIEF

**Claim by the United States
for Violations of the Martinez Title V Permit for
Exceeding the Applicable CO Limit for the FCCU at the Martinez Refinery**

398.     Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

399.     At all times relevant herein, Condition 11433(2) of the Martinez Title V Permit has prohibited Defendant Tesoro R&M from emitting to the atmosphere from the FCCU at the Martinez Refinery (Martinez FCCU) more than 121.9 tons per calendar year of CO.

400.   In 2006 and 2007, Defendant Tesoro R&M emitted to the atmosphere from the Martinez FCCU more than 121.9 tons per calendar year of CO in violation the Martinez Title V Permit Condition 11433(2).

401.   As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

### THIRTY-SIXTH CLAIM FOR RELIEF

**Claim by the United States
for PSD and SIP Violations Related to NOx Emissions Associated with
2007 Modifications to the FCCU at the SLC Refinery**

402.   Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

403.   In March and April of 2007, Defendant Tesoro R&M commenced extensive physical and operational changes on the SLC FCCU at the SLC Refinery (2007 FCCU Project).

404.   The physical changes and/or changes in the method of operation of the SLC FCCU undertaken in the 2007 FCCU Project constituted one or more "major modification(s)" of the SLC Refinery within the meaning of 40 C.F.R. § 52.21(b)(2) and Utah Air Conservation Regulations R307-405 (Utah Admin. Code r.) for NOx because:  (a) they are "modifications" within the meaning of Section 169(2)(C) of the CAA, 42 U.S.C. § 7479(2)(C) (incorporating the definition of "modification" from 42 U.S.C. § 7411(a)(4)); (b) they resulted in a "significant emissions increase" of NOx, as that term is defined in 40 C.F.R. § 52.21(b)(40); and (b) they resulted in a significant "net emissions increase" of NOx, as that term is defined in 40 C.F.R.

§ 52.21(b)(3); where, in both cases, 40 C.F.R. § 52.21(b)(23) defines "significant" as a rate of emissions that would equal or exceed 40 TPY of NOx.  *See* Utah Admin Code r. R307-405.

405.     Because the 2007 FCCU Project was a "major modification" for NOx, the PSD Program and Regulations and Utah SIP required and continue to require that Defendant Tesoro R&M:  (a) undergo a BACT review for NOx emissions from the SLC FCCU; (b) obtain appropriate permits to construct and operate the modified FCCU; (c) demonstrate that the emissions increases from the 2007 FCCU Project would not cause or contribute to violations of air quality standards; (d) provide for review and public comment on the air quality impacts of the 2007 FCCU Project; and (e) comply with BACT emission limits on NOx from the SLC FCCU. 42 U.S.C. § 7475(a); 40 C.F.R. §5 2.21; Utah Admin Code r. R307-405

406.     Tesoro R&M commenced construction of the 2007 FCCU Project and has subsequently operated the modified SLC FCCU without satisfying the requirements set forth in (a) through (e) in the foregoing paragraph in violation of the PSD Program and Regulations and Utah SIP (including Section 165 of the CAA, 42 U.S.C. §7475(a), 40 C.F.R. §52.21, and Utah Admin Code r. R307-405).

407.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

## THIRTY-SEVENTH CLAIM FOR RELIEF

**Claim by the United States
for Violation of federal Title V Requirements
with Respect to the 2007 FCCU Project at the SLC Refinery**

408.    Paragraphs 1 through 132 and 403 through 405 are re-alleged and incorporated by reference as if fully set forth herein.

409.    As set forth in Paragraphs 403-405 above, Defendant Tesoro R&M undertook the 2007 FCCU Project which, as a "major modification," triggered requirements, *inter alia*, to obtain PSD Program permits requiring compliance with BACT emission limits on NOx from the SLC FCCU, and to operate the SLC FCCU in compliance with such BACT emission limits.

410.    At all times relevant herein, the federal Title V Program and Regulations have required and continue to require that Tesoro R&M submit a Title V permit application with respect to the 2007 FCCU Project containing:  (a) information sufficient to determine applicable air pollution control requirements (including requirements to meet applicable control technology requirements under the PSD Program and Regulations); (b) information that may be necessary to determine the applicability of other applicable requirements of the CAA, (c) a compliance plan for all applicable requirements for which the source is not in compliance; and (d) a certification of compliance with all applicable requirements by a responsible official.  42 U.S.C. § 7661b(b), (c); 40 C.F.R. § 70.5(a).

411.    At all times relevant herein, the federal Title V Program and Regulations and Utah Title V program have required that any permit applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.  40 C.F.R. § 70.5(b).

412.     With respect to the 2007 FCCU Project, Defendant Tesoro R&M failed to submit a complete and timely application for a Title V operating permit, or submit supplementary facts or corrected information for a previously submitted Title V permit application that satisfied the requirements set forth in (a) through (d) of Paragraph 410 above in violation of the federal Title V Program and Regulations (including 40 C.F.R. § 70.5(b)).

413.     At all times relevant herein, the federal Title V Program and Regulations have provided that no source may operate except in compliance with a Title V permit.  42 U.S.C. § 7661a(a); 40 C.F.R. §§ 70.1(b) and 70.7(b).

414.     Since 2007, Defendant Tesoro R&M has operated and continues to operate the SLC FCCU without having a valid Title V operating permit requiring compliance with: (a) BACT emission limits on NOx from the SLC FCCU; or (b) a compliance plan for coming into compliance with such BACT limits in violation of the federal Title V Program and Regulations (including Section 502(a) of the CAA, 2 U.S.C. § 7661a(a), and 40 C.F.R. §§ 70.1(b) and 70.7(b)).

415.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

## THIRTY-EIGHTH CLAIM FOR RELIEF

### Claim by all Plaintiffs for PSD and AIP Violations
### With Respect to One or More of Defendants' Flares

416.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

417.    Upon information likely to be discovered after a reasonable opportunity for further investigation and discovery, Defendants made physical and or changes in the method of operation of one or more of Defendants' Flares.  The physical or operation changes performed at one or more of Defendants' Flares include, but are not limited to, increasing gas streams and tying new gas streams into flare headers.

418.    Upon information likely to be discovered after a reasonable opportunity for further investigation and discovery, the physical and/or operational changes made to one or more of Defendants' Flares constituted one or more "major modifications," as that term is defined in 40 C.F.R. § 52.21(b)(2) and AIPs for CO, $H_2S$, $SO_2$, and VOCs because:  (a) they constitute "modifications" within the meaning of Section 169(2)(C) of the CAA, 42 U.S.C. § 7479(2)(C) (incorporating the definition of that term from 42 U.S.C. § 7411(a)(4)); (b) they resulted in a "significant emissions increase" of CO, $H_2S$, $SO_2$, and VOCs as that term is defined in 40 C.F.R. § 52.21(b)(40); and (c) they resulted in a significant "net emissions increase" of CO, $H_2S$, $SO_2$, and VOCs, as that term is defined in 40 C.F.R. § 52.21(b)(3); where, in both cases, "significant" is defined in 40 C.F.R. § 52.21(b)(23) as a rate of emissions that would equal or exceed one hundred tons per year of CO, ten tons per year of $H_2S$, and forty tons per year of either $SO_2$ or VOCs.

419.     Because the physical and/or operational changes to one or more of Defendants' Flares constituted one or more "major modifications" for CO, $H_2S$, $SO_2$, and VOCs, the federal PSD Program and Regulations and AIPs required and continue to require that Defendants: (a) undergo a BACT review for CO, $H_2S$, $SO_2$, and VOCs emissions from the modified flares; (b) obtain appropriate permits to construct and operate the constructed or modified flares; (c) demonstrate that the emissions increases from the construction and/or major modification(s) to the flares would not cause or contribute to violations of air quality standards; (d) provide for review and public comment on the air quality impacts of the construction and/or major modification on the flares; and (e) comply with BACT emission limits on CO, $H_2S$, $SO_2$, and VOCs from the modified flares.  42 U.S.C. § 7475(a), 40.C.F.R. § 52.21.

420.     Upon information likely to be discovered after a reasonable opportunity for further investigation and discovery, Defendants commenced one or more "major modifications" to one or more of the Defendants' Flares, and operated the modified flares without satisfying the requirements set forth in (a) through (e) of the foregoing paragraph in violation of the PSD Program and Regulations and AIPs (including Section 165 of the CAA, 42 U.S.C. § 7475, and 40 C.F.R. § 52.21).

421.     As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

422.     Under Alaska Statue § 46.03.760, for the above-listed violations at the Kenai Refinery, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor

more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

423.    As a result of the above-listed violations at the Kapolei Refinery, pursuant to HRS § 342B-44, Defendant Par is liable for injunctive and/or a fine of up to $25,000 for each separate offense, with each day of each violation constituting a separate offense.

424.    As a result of the above-listed violations at the Anacortes Refinery, pursuant to RCW § 70.94.431, Defendant Tesoro R&M is liable for a permanent or temporary injunction and/or the assessment of a civil penalty of up to $13,000 per violation per day for each violation that occurs between July 14, 2001, and July 9, 2003, inclusive, up to $14,000 per violation per day for each violation that occurs between July 10, 2003, and July 13, 2005, inclusive, up to $14,500 per violation per day for each violation that occurs between July 14, 2005, and November 7, 2007, inclusive, and up to $15,500 per violation per day for each violation that occurs after November 8, 2007.

## THIRTY-NINTH CLAIM FOR RELIEF

**Claim by the United States
for NNSR Violations with respect to One or More
of Defendants' Flares at the Martinez Refinery**

425.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

426.    The Martinez Refinery is located in an area designated as Non-Attainment for ozone.  Flares at the Martinez Refinery (Martinez Flares) emit POCs, which are compounds that are precursors to ozone.

427.    In accordance with Section 173 of the CAA, 42 U.S.C. § 7503, and the NNSR Program and Regulations, on January 26, 1999, EPA approved portions of BAAQMD Rule 2-2,

which was incorporated into the California SIP.  64 Fed. Reg. 3,850 (Jan. 26, 1999); 40 C.F.R.

§ 52.220(c)(199)(i)(A)(8)).  BAAQMD Rule 2-2 provides for the review of new and modified

sources and provide mechanisms, including the use of the lowest achievable emissions rate

(referred to herein as "California BACT"), by which authorities to construct such sources may be

granted.  BAAQMD Rule 2-2-101.  A "source" under BAAQMD Rule 2-2 is any article,

machine, equipment, operation, contrivance, or related groupings of such that may produce or

emit air pollutants.  BAAQMD Rule 2-2-234.

428.    Among other things, BAAQMD Rule 2-2 requires an applicant for an authority to

construct or a permit to operate to apply California BACT to any new or modified source that

results in an emission from a new source or an increase in emissions from a modified source of

POCs in excess of 10 pounds per highest day or a cumulative increase since April 5, 1991, for a

modified source of 10 pounds per highest day.  BAAQMD Rule 2-2-301.  A "new source" under

BAAQMD Rule 2-2 includes, among other things, any replacement of a source occurring after

March 7, 1979.  BAAQMD Rule 2-2-225.4.  A "modified source or facility" under BAAQMD

Rule 2-2 includes, among other things, any existing source or facility that will undergo a

physical change, change in the method of operation of, or addition to an existing facility which

results or may result in either an increase of the permitted emission level of a source, or of any

air pollutant subject to BAAQMD's control.  BAAQMD Rule 2-2-223.

429.    Upon information likely to be discovered after a reasonable opportunity for

further investigation and discovery, Defendant Tesoro R&M made physical changes to, or

changed the method of operation of, one or more of the Martinez Flares including, but not

limited to:  increasing gas streams and tying new gas streams into flare headers.  One or more of

the physical or operational changes to the Martinez Flares resulted in cumulative increases in emissions of POCs since April 5, 1991, of 10 pounds per highest day.

430.    Because the physical or operational changes to the Martinez Flares resulted in cumulative increases in emissions of POCs since April 5, 1991, of 10 pounds per highest day, BAAQMD Rule 2-2 required and continues to require that Defendant Tesoro R&M comply with California BACT emissions limitations for POCs from the modified Martinez Flares.  BAAQMD Rule 2-2.

431.    Upon information likely to be discovered after a reasonable opportunity for further investigation and discovery, Tesoro R&M commenced construction and/or modification of, and has subsequently operated one or more Martinez Flares without satisfying the requirements listed in the foregoing paragraph in violation of BAAQMD Rule 2-2.

432.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant Tesoro R&M is liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

## FORTIETH CLAIM FOR RELIEF

### Claim by all Plaintiffs
### for Violations of Federal and State Title V Requirements
### with Respect to One or more of Defendants' Flares

433.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

434.    Upon information likely to be discovered after a reasonable opportunity for further investigation and discovery, Defendants undertook modifications at one or more of

Defendants' Flares that triggered requirements, *inter alia*, to obtain PSD and/or NNSR Program permits requiring compliance with BACT emission limits on CO, H2S, SO2, and VOCs from one or more of Defendants' Flares, and/or, with respect to one or more Martinez Flares, California BACT emission limits on POCs, and to operate such flares in compliance with such BACT and/or California BACT emission limits.

435.   At all times relevant herein, the federal Title V Program and Regulations and the Alaska, Hawaii, and NWCAA Title V regulations have required Defendants to submit Title V permit applications with respect to the modifications of one or more of Defendants' Flares containing:  (a) information sufficient to determine all applicable air pollution control requirements (including any requirement to meet the applicable control technology requirements under the PSD and NNSR Programs and Regulations); (b) information that may be necessary to determine the applicability of other applicable requirements of the CAA; (c) a compliance plan for all applicable requirements for which a flare is not in compliance; and (d) a certification of compliance with all applicable requirements by a responsible official.  42 U.S.C. § 7661b(b) and (c); 40 C.F.R. § 70.5; 18 AAC §50.326(a); HAR §§ 11-60.1-83-84; NWCAA Regulations Section 104.1.

436.   At all times relevant herein, the federal Title V Program and Regulations and the Alaska, Hawaii, and NWCAA Title V regulations have provided that any permit applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.  40 C.F.R. § 70.5(b); NWCAA Regulations Section 104.1; Alaska Statute § 46.14.160(c); 18 AAC § 50.040(j) (incorporating 40 C.F.R. 71.5(b) by reference); HAR § 11-60.1-84.

437.    Upon information likely to be discovered after a reasonable opportunity for further investigation and discovery, with respect to one or more modifications of Defendants' Flares, Defendants failed to submit complete and timely applications for Title V permits, or submit supplementary facts or corrected information for previously submitted Title V permit applications that satisfied the requirements set forth in (a) through (d) of Paragraph 435 above in violation of the federal Title V Program and Regulations and the Alaska, Hawaii, and NWCAA Title V regulations (including 40 C.F.R. § 70.5(b), Alaska Statute § 46.14.160(c), and 18 AAC § 50.040(j) (incorporating 40 C.F.R. 71.5(b) by reference), HAR § 11-60.1-84, and NWCAA Regulations Section 104.1).

438.    The federal Title V Program and Regulations, and the Alaska, Hawaii, and NWCAA Title V regulations provide that no source may operate except in compliance with a Title V permit.  42 U.S.C. § 7661a(a); 40 C.F.R. §§ 70.1(b), 70.7(b); Alaska Statute §§ 46.14.120(b), 130(b); HAR § 11-60.1-82; NWCAA Regulations Section 104.1.

439.    Upon information likely to be discovered after a reasonable opportunity for further investigation and discovery, Defendants have operated and continue to operate one or more of Defendants' Flares without having a valid Title V operating permit requiring compliance with:  (a) BACT emission limits on CO, $H_2S$, $SO_2$, and VOCs from one or more of Defendants' Flares, and/or California BACT emission limits on POCs from one or more of the Martinez Flares; or (b) a compliance plan for coming into compliance with such BACT and/or California BACT emission limits in violation of the federal Title V Program and Regulations and the Alaska, Hawaii, and NWCAA Title V regulations (including Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), 40 C.F.R. §§ 70.1(b) and 70.7(b), Alaska Statute §§ 46.14.129(b), 130(b), HAR § 11-60.1-82, and NWCAA Regulation Section 104.1).

440.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

441.    Under Alaska Statue § 46.03.760, for the above-listed violations at the Kenai Refinery, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

442.    As a result of the above-listed violations at the Kapolei Refinery, pursuant to HRS § 342B-44, Defendant Par is liable for injunctive and/or a fine of up to $25,000 for each separate offense, with each day of each violation constituting a separate offense.

443.    As a result of the above-listed violations at the Anacortes Refinery, pursuant to RCW § 70.94.431, Defendant Tesoro R&M is liable for a permanent or temporary injunction and/or the assessment of a civil penalty of up to $13,000 per violation per day for each violation that occurs between July 14, 2001, and July 9, 2003, inclusive, up to $14,000 per violation per day for each violation that occurs between July 10, 2003, and July 13, 2005, inclusive, up to $14,500 per violation per day for each violation that occurs between July 14, 2005, and November 7, 2007, inclusive, and up to $15,500 per violation per day for each violation that occurs after November 8, 2007.

## FORTY-FIRST CLAIM FOR RELIEF

**Claim by all Plaintiffs for Violations of NSPS and NESHAP Regulations,
Applicable State Requirements, and Title V Permit Requirements
with Respect to One or More of Defendants' Flares**

444.    Paragraphs 1 through 132 are re-alleged and incorporated by reference as if fully set forth herein.

445.    At all times relevant herein, one or more of Defendants' Flares have been "affected facilities" subject to the NSPS Program and Regulations, and "affected sources" subject to the NESHAP Program and Regulations.

446.    At all times relevant herein, NSPS Subpart A has required that flares which are affected facilities be operated "in a manner consistent with good air pollution control practice for minimizing emissions."  40 C.F.R. § 60.11(d).

a.    Good air pollution control practices for minimizing emissions at flares involve, *inter alia*, combusting essentially all molecules of $H_2S$, hydrocarbons, and HAPs in the gases sent to the flares by ensuring that they have sufficient heating value and oxygen to allow for complete combustion.  For steam-assisted flares, good air pollution control practices for minimizing emissions also involve, *inter alia*, injecting steam at a rate that maximizes flame stability and flare combustion efficiency.

b.    In order to ensure that the gases sent to flares have sufficient heating value to ensure complete combustion, good air pollution control practices for minimizing emissions at flares involve, *inter alia*, monitoring, measuring, and/or calculating the net heating value (NHV) of the gases in the combustion zone (Combustion Zone Gas) of a flare.  In addition, supplemental gas must be immediately available for addition to the gas being sent to the flare (the Vent Gas) to

ensure that the NHV of the Combustion Zone Gas is maintained at a level that ensures adequate flare combustion efficiency.

447.    At all times relevant herein, NSPS Subpart A has required that whenever flares are used as control devices:  (a) flares shall be designed and operated with no visible emissions, 40 C.F.R. § 60.18(c)(1); (b) flares shall be operated with a flame present at all times, 40 C.F.R. § 60.18(c)(2); (c) for steam-assisted flares, the net heating value of the gas being combusted must be 300 BTU per standard cubic foot or greater, 40 C.F.R. § 60.18(c)(3)(ii); (d) for steam-assisted flares, certain exit velocity requirements must be met, 40 C.F.R. § 60.18(c)(4); (e) for all flares, the owner or operator must monitor the flare to ensure that it is operated and maintained in conformance with its design, 40 C.F.R. § 60.18(d); and (f) a flare must be operated at all times when emissions are vented to it, 40 C.F.R. § 60.18(e).

448.    At all times relevant herein, NSPS Subparts GGG and GGGa, NESHAP Subpart CC, and NESHAP Subpart FF have each required that certain flares comply with one or more of the NSPS Subpart A provisions listed in the preceding paragraph.  NSPS Subparts GGG and GGGa, and NESHAP Subpart CC (insofar as they require compliance with NSPS Subparts VV and VVa, 40 C.F.R. §§ 60.482-10, 60.482a-10, which, in turn, require that flares comply with NSPS Subpart A, 40 C.F.R. § 60.18(d)); NESHAP Subpart FF, 40 C.F.R. § 61.349(a)(2)(iii) (insofar as it requires that flares comply with NSPS Subpart A, 40 C.F.R. § 60.18).

449.    At all times relevant herein, one or more of Defendants' Flares has been subject to NSPS Subpart J, because they are FGCDs, the definition of which includes flares (40 C.F.R. § 60.101(g)), and were constructed or modified after June 11, 1973, and on or before June 24, 2008.  40 C.F.R. § 60.100(b).  At all times relevant herein, NSPS Subpart J has prohibited the owner or operator of FGCDs that are affected facilities from burning any fuel gas that contains

$H_2S$ in excess of 230 milligrams per dry standard cubic meter unless certain exceptions apply. 40 C.F.R. § 60.104(a)(1), (g).  NSPS Subpart J also requires the owner or operator of a flare that is an affected facility to install, calibrate, operate, and maintain an instrument for continuously monitoring and recording the concentration (dry basis) of $H_2S$ in the fuel gases before being burned in any flare.  40 C.F.R. § 60.105(a)(4).

450.    At all times relevant herein, one or more of Defendants' Flares has been subject to Part 63 NESHAP Subpart A because they are "flares" and/or used as "control devices" within the meaning of the NESHAP Regulations.  NESHAP Subpart CC, 40 C.F.R. §§ 63.643(a)(1), 63.648(a) (insofar as it relates to flares and requires compliance with Part 63 NESHAP Subpart A, 40 C.F.R. § 63.11(b)(1)); NESHAP Subpart UUU, 40 C.F.R. § 63.1566(a)(1)(i) (insofar as it relates to flares and requires compliance with Part 63 NESHAP Subpart A, 40 C.F.R. §§ 63.6(e)(1) and 63.11(b)).

451.    At all times relevant herein, Part 63 NESHAP Subpart A has required flares that are affected sources to be operated with "good air pollution control practices for minimizing emissions."  40 C.F.R. § 63.6(e)(1).  In addition, Part 63 NESHAP Subpart A contains specific requirements that apply whenever flares are used as control devices.  40 C.F.R. § 63.11(b).  Of relevance to this Complaint are the following requirements:  (a) flares shall be designed and operated with no visible emissions, 40 C.F.R. § 63.11(b)(4); (b) flares shall be operated with a flame present at all times, 40 C.F.R. § 63.11(b)(5); (c) for steam-assisted flares, the net heating value of the gas being combusted must be 300 BTU per standard cubic foot or greater, 40 C.F.R. § 63.11(b)(6)(ii); (d) for steam-assisted flares, certain exit velocity requirements must be met, 40 C.F.R. § 63.11(b)(7); (e) the owner or operator must monitor the flare to ensure that it is

operated and maintained in conformance with its design, 40 C.F.R. § 63.11(b)(1); and (f) a flare must be operated at all times when emissions are vented to it. 40 C.F.R. § 63.11(b)(3).

452.    In Alaska, Hawaii, and Washington, applicable state rules adopt, incorporate, and implement one or more of the requirements in the foregoing Paragraphs 445-451.

453.    The Title V permits issued to Defendants' Refineries by the applicable permitting authorities pursuant to Title V of the CAA, 42 U.S.C. § 7661 *et seq.*, adopt, incorporate, and implement one or more of the requirements in the foregoing Paragraphs 445-451.

454.    Upon information likely to be discovered after a reasonable opportunity for investigation and discovery, at various times from 2006 to the present, Defendants violated one or more of the following requirements at one or more of Defendants' Flares:

    a.    NSPS Subpart A and Part 63 NESHAP Subpart A, 40 C.F.R. 60.11(d); 40 C.F.R. § 63.6(e), by not operating a flare "in a manner consistent with good air pollution control practices for minimizing emissions." Upon information likely to be discovered after a reasonable opportunity for investigation and discovery, Defendants operated one or more of Defendants' Flares in the one or more of the following ways that were inconsistent with "good air pollution control practices for minimizing emissions":

        i.    Operating flares without sufficient NHV in the Combustion Zone Gas which reduced flare combustion efficiency and resulted in emissions to the atmosphere of uncombusted $H_2S$, uncombusted and partially-combusted HAPs and hydrocarbons (including VOCs) and CO;

        ii.    Failing to have or use equipment or monitoring systems at the flares to enable Defendants to calculate NHV in the Combustion Zone Gas of the Flares and failed to have supplemental gas immediately available for addition to the Vent Gas; and/or

iii.    Failed to install or use properly Vent Gas Flow.

b.    NSPS Subpart A and Part 63 NESHAP Subpart A, 40 C.F.R. § 60.18(c)(1); 40 C.F.R. § 63.11(b)(4), by not designing and operating a flare with no visible emissions;

c.    NSPS Subpart A and Part 63 NESHAP Subpart A 40 C.F.R. § 60.18(c)(2); 40 C.F.R. § 63.11(b)(5), by not operating a flare with a flame present at all times;

d.    NSPS Subpart A and Part 63 NESHAP Subpart A, 40 C.F.R. § 60.18(c)(3)(ii); 40 C.F.R. § 63.11(b)(6)(ii), by not operating a steam-assisted flare with a net heating value of the gas being combusted at 300 BTU per standard cubic foot or greater;

e.    NSPS Subpart A and Part 63 NESHAP Subpart A, 40 C.F.R. § 60.18(c)(4); 40 C.F.R. § 63.11(b)(7), by not complying with the specified exit velocity requirements;

f.    NSPS Subpart A and Part 63 NESHAP Subpart A, 40 C.F.R. § 60.18(d); 40 C.F.R. § 63.11(b)(1), by not monitoring the flare to ensure it is operated and maintained in conformance with its design;

g.    NSPS Subpart A and Part 63 NESHAP Subpart A, 40 C.F.R. § 60.18(e); 40 C.F.R. § 63.11(b)(3), by not operating a flare at all times when emissions are vented to it;

h.    NSPS Subpart J, 40 C.F.R. § 60.104(a)(1), (g), by burning in a flare fuel gas that contains $H_2S$ in excess of 230 milligrams per dry standard cubic meter unless certain exceptions apply; and.

i.     NSPS Subpart J, 40 C.F.R. § 60.105(a)(4), by failing to install, calibrate, operate, and maintain an instrument for continuously monitoring and recording the concentration (dry basis) of $H_2S$ in the fuel gases before being burned in any flare.

455.    Defendants' non-compliance with the requirements set forth in Paragraph 454.a-i above constitutes violations of:

      a.      Sections 111 and 112, of the CAA, 42 U.S.C. §§ 7411, 7412;

      b.      NSPS Subpart A, 40 C.F.R. §§ 60.11(d), 60.18(d);

      c.      NSPS Subparts GGG and GGGa, 40 C.F.R. §§ 60.592(a), 60.592a(a), (insofar as these provisions relate to flares and require compliance with NSPS Subparts VV and VVa, 40 C.F.R. §§ 60.482 and 60.482a, which in turn requires that flares comply with NSPS Subpart A, 40 C.F.R. § 60.18(d));

      d.      NSPS Subpart J, 40 C.F.R. § 60.104-105;

      e.      NESHAP Subpart FF, 40 C.F.R. § 61.349(a)(2)(iii) (insofar as that provision requires compliance with NSPS Subpart A, 40 C.F.R. § 60.18(d));

      f.      NESHAP Subpart CC, 40 C.F.R. §§ 63.643(a)(1), 63.648(a) (insofar as these provisions relate to flares and require compliance with NSPS Subparts VV and VVa and Part 63 NESHAP Subpart A, 40 C.F.R. § 63.11(b)(1));

      g.      NESHAP Subpart UUU, 40 C.F.R. § 63.1566(a)(1)(i) (insofar as it relates to flares and requires compliance with 40 C.F.R. §§ 63.6(e) and 63.11(b)); and

      h.      All applicable state rules and Title V permits applicable to Defendants' Refineries to the extent they adopt, incorporate, or implement any of the aforementioned requirements.

456.    As a result of the above-listed violations, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable for injunctive relief and the assessment of civil penalties of not more than $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009.

457.    Under Alaska Statue § 46.03.760, for the above-listed violations at the Kenai Refinery, Defendant Tesoro Alaska is subject to a civil assessment of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues.

458.    As a result of the above-listed violations at the Kapolei Refinery, pursuant to HRS § 342B-44, Defendant Par is liable for injunctive relief and/or a fine of up to $25,000 for each separate offense, with each day of each violation constituting a separate offense.

459.    As a result of the above-listed violations at the Anacortes Refinery, pursuant to RCW § 70.94.431, Defendant Tesoro R&M is liable for a permanent or temporary injunction and/or the assessment of a civil penalty of up to $13,000 per violation per day for each violation that occurs between July 14, 2001, and July 9, 2003, inclusive, up to $14,000 per violation per day for each violation that occurs between July 10, 2003, and July 13, 2005, inclusive, up to $14,500 per violation per day for each violation that occurs between July 14, 2005, and November 7, 2007, inclusive, and up to $15,500 per violation per day for each violation that occurs after November 8, 2007.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

1.      Order Defendants to immediately comply with the federal and state statutory, regulatory, and permit requirements cited in this Complaint under the Clean Air Act;

2.      Order Defendants to take appropriate measures to mitigate the effects of their violations;

3.      For all violations, award the United States civil penalties of up to $32,500 per violation per day for each violation that occurred after March 15, 2004, through January 12, 2009, and not more than $37,500 per violation per day for each violation that occurred after January 12, 2009;

4.      For violations at the Anacortes Refinery, award Plaintiff NWCAA civil penalties of up to $13,000 per violation per day for each violation that occurs between July 14, 2001, and July 9, 2003, inclusive, up to $14,000 per violation per day for each violation that occurs between July 10, 2003, and July 13, 2005, inclusive, up to $14,500 per violation per day for each violation that occurs between July 14, 2005, and November 7, 2007, inclusive, and up to $15,500 per violation per day for each violation that occurs after November 8, 2007;

5.      For violations at the Kapolei Refinery, award Plaintiff the State of Hawaii civil penalties of up to $25,000 for each separate offense, with each day of each violation constituting a separate offense;

6.      For violations at the Kenai Refinery, award Plaintiff the State of Alaska civil penalties of not less than $500 nor more than $100,000 for the initial violation, not more than $5,000 for each day after that on which the violation continues;

7.      Award the Plaintiffs their costs and expenses incurred in this action; and

8.      Grant such other and further relief as may be just and proper and as the public interest and the equities of the case may require.

Respectfully Submitted,

FOR THE UNITED STATES OF AMERICA:

THE UNITED STATES DEPARTMENT OF JUSTICE

/s/ John C. Cruden
JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division

/s/ Elizabeth L. Loeb
ELIZABETH L. LOEB
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Elizabeth.Loeb@usdoj.gov
(202) 616-8916

RICHARD L. DURBIN, JR.
United States Attorney

/s/ Susan Strawn
SUSAN STRAWN
Tex. Bar No. 19374330
Assistant United States Attorney
601 NW Loop 410, Ste 600
San Antonio, TX 78216
Tel. (210) 384-7388
Fax (210)384-7312
SStrawn@usa.doj.gov

FOR THE STATE OF ALASKA

FOR THE STATE OF ALASKA

CRAIG W. RICHARDS
ATTORNEY GENERAL

By:    /s/ Jennifer A. Currie
        JENNIFER A. CURRIE
        Assistant Attorney General
        Alaska Bar No. 0609056
        Department of Law
        1031 West Fourth Avenue, Suite 200
        Anchorage, AK 99501
        Phone:  (907) 269-5274

FOR THE STATE OF HAWAII:

DOUGLAS S. CHIN (Hawaii Bar No. 6465)
Attorney General
State of Hawaii

By:      /s/ William F. Cooper
HEIDI M. RIAN (Hawaii Bar No. 3473)
WILLIAM F. COOPER (Hawaii Bar No. 4501)
Deputy Attorneys General
465 South King Street, Room 200
Honolulu, Hawaii 96813

FOR THE NORTHWEST CLEAN AIR AGENCY:

/s/ Laughlan H. Clark
LAUGHLAN H. CLARK
WSBA #10996
Carmichael Clark, P.S.
1700 D Street
Bellingham, WA  98227
(360) 647-1500